IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

COSMOKEY SOLUTIONS, )
)
Plaintiff, )
) C.A. No. 18-1477-JLH
v. )
) JURY TRIAL DEMANDED
DUO SECURITY, INC., et al., )
)
Defendants. )

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Wednesday, May 21, 2025
3:01 p.m.
Pretrial Conference

BEFORE: THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

POTTER ANDERSON & CORROON LLP
BY: DAVID E. MOORE, ESQUIRE

-and-

GOODWIN PROCTER LLP
BY: SCOTT WEINGAERTNER, ESQUIRE
BY: STEFAN MENTZER, ESQUIRE
BY: JOHN PADRO, ESQUIRE
BY: MATTHEW WISNIEFF, ESQUIRE
BY: LAUREN K. PELLETIER, ESQUIRE

For the Plaintiff

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: JENNIFER YING, ESQUIRE
BY: TRAVIS J. MURRAY, ESQUIRE

-and-

APPEARANCES CONTINUED:

GIBSON DUNN & CRUTCHER, LLP
BY: BRIAN ROSENTHAL, ESQUIRE
BY: JAYSEN S. CHUNG, ESQUIRE
BY: NATHANIEL R. SCHARN, ESQUIRE
BY: YANA NEBUCHINA, ESQUIRE

For the Defendants

*** PROCEEDINGS ***

03:01:36

03:01:37 DEPUTY CLERK: All rise. Court is now in

03:01:39 session. The Honorable Jennifer L. Hall presiding.

03:01:39 THE COURT: Please be seated.

03:04:12 All right. We're here for the pretrial

03:04:14 conference. This is *CosmoKey Solutions vs. Duo, et al.* It's

03:04:18 Civil Action Number 18-1477.

03:04:21 Let's go ahead and put our appearances on the

03:04:23 record.

03:04:23 MR. MOORE: Good afternoon, Your Honor. David

03:04:25 Moore from Potter Anderson on behalf of the Plaintiff,

03:04:31 CosmoKey. I'm joined by my co-counsel from Goodwin, Scott

03:04:31 Weingaertner.

03:04:33 MR. WEINGAERTNER: Good afternoon, Your Honor.

03:04:33 MR. MOORE: Stefan Mentzer.

03:04:33 MR. MENTZER: Good afternoon, Your Honor.

03:04:36 MR. MOORE: John Padro.

03:04:36 MR. PADRO: Good afternoon, Your Honor.

03:04:37 MR. MOORE: Matthew Wisnieff.

MR. WISNIEFF: Good afternoon, Your Honor.

MR. MOORE: And Lauren Pelletier.

MS. PELLETIER: Good afternoon, Your Honor.

THE COURT: All right. Good to see everybody.

MS. YING: Good afternoon, Your Honor. Jennifer Ying from Morris Nichols Arsht & Tunnell. I have Travis Murray from Morris Nichols, also, here with me.

And then I'm joined today at counsel table from Gibson Dunn, Brian Rosenthal.

MR. ROSENTHAL: Good afternoon, Your Honor.

MS. YING: Jaysen Chung.

MR. CHUNG: Good afternoon, Your Honor.

MS. YING: Yana Nebuchina.

MS. NEBUCHINA: Good afternoon, Your Honor.

MS. YING: And Nathan Scharn.

MR. SCHARN: Good afternoon, Your Honor.

THE COURT: All right. Good afternoon, everyone.

All right. We've got three volumes of the Pretrial Order. It's got tens of disputes and subparts of disputes. So we can just start working through it.

Before we get started, was there anything resolved that I should know about before we get going?

MR. ROSENTHAL: Your Honor, I wouldn't say -- yes. There have been a few things that have been resolved,

and there are a few things that I think are really close to being resolved that we can either lay out now or as we pick them up, we can stand up and say, We've got that one covered, whichever one you prefer.

THE COURT: Yeah, just make a move before I start opening my mouth if it's something you've already got resolved.

MR. ROSENTHAL: Okay.

THE COURT: All right. Great.

MR. ROSENTHAL: Thank you.

THE COURT: All right. I know that we have still under advisement a Daubert motion pertaining to expert Lewis. We're still taking a look at that. I don't have it ready to rule on today. So you can expect something from us in the coming days.

I'll tell you that we are going to start the jury trial on June 9th at 9:00 a.m. That's the way that it was set in our system when Judge Connolly originally ordered that date. We never changed it. So the jury notices went out timed to them showing up on that Monday. So at this point those notices have already gone out. We'll do the jury selection on Monday morning.

I have this later in my notes, but I might as well tell you now. What I was thinking was that we would have 11 hours per side for the -- maximum for the portion of

03:07:19 the case that will be tried to the jury. That's standard in this district. And then each side could have up to two hours or -- no, sorry. Each side could have two hours for the inequitable conduct bench trial.

03:07:35 If you wanted more than that for that portion of the trial, you could take time away from your 11 hours and put it towards the bench trial, but it doesn't go the other way. We can have a maximum of 11 hours for each side presented to the jury, and that's so that we can get done on time and get the case to the jury on Friday afternoon.

03:07:53 Does that make sense to everybody?

03:07:55 MR. ROSENTHAL: Yes, Your Honor.

03:07:56 MR. WEINGAERTNER: Yes, Your Honor.

03:07:56 THE COURT: And I'll just note that when you add that all up, 11 plus two times two is 26, which is pretty close to what the parties had requested for trial time. So that takes care of that.

03:08:12 MR. ROSENTHAL: Your Honor.

03:08:18 THE COURT: Yes.

03:08:19 MR. ROSENTHAL: I'm sorry. Just on that last point, does the Court have any preference as to when during the week you'd like to have us do that inequitable portion?

03:08:27 THE COURT: That's a good question and I did have that in my notes. So what I was thinking is that we could go Monday night and Tuesday night up to two hours each

03:08:38 night, so we can get it done. And then we'll try to do as much as the charge conference as we can Wednesday night. And to the extent there are any remaining disputes that we held over or that the parties were going to met and confer about, we could get those straightened out Thursday night such that we would have a final version of the jury instructions ready to go, near final, by Thursday night so that the parties could prepare their closing arguments accordingly.

03:09:01 MR. ROSENTHAL: Perfect, Your Honor. Thank you.

03:09:06 THE COURT: All right. So let's talk about some of the disputes in the body of the Pretrial Order.

03:09:11 And by the way, I just wanted at the outset to thank counsel for the Pretrial Order. This is probably the best one we've seen in terms of complying with everything that we normally do in jury trials. And I know we have Delaware counsel to thank for that. I really do appreciate it. It made it so much easier for us to go through.

03:09:32 We had a dispute -- well, I don't even know if it was a dispute. We had proposals on Page 6 at Footnote 2. It didn't look like it was something we needed to resolve here.

03:09:51 MR. ROSENTHAL: I don't think so, Your Honor. I think the Court has made clear in its most recent Summary Judgment Order that there will be at least one claim

construction or the potential for at least one claim construction issue that may be raised at the charge conference with respect to authentication function. This note is simply saying that there is yet another claim construction issue that was held over from the Markman proceeding, in our view, that that's still live until the jury gets the case. And we're just making that note here, and we'll urge what we'd like to urge at the charge conference.

THE COURT: Okay. Well, I will say that that is fine with me, but Plaintiff will also have the opportunity at the charge conference to say that whatever dispute you're planning to raise was raised too late. And so I won't exclude the possibility that I'll say it's too late to bring it up.

Counsel.

MR. ROSENTHAL: Thank you, Your Honor.

THE COURT: All right.

Page 12, Paragraph 44 and, also, Page 22, Footnote 95 are related to opening statements and demonstratives.

So what's the issue, Plaintiff, with the proposal in Paragraph 44?

MR. WEINGAERTNER: Your Honor, we've considered and agreed with Defendants' position.

03:11:33 THE COURT: Okay. That's great. So that will be included in the Pretrial Order.

03:11:37 And then, as long as we're talking about opening statements, I mean, I would have hoped you-all could have just worked this out. Because if you want me to decide how many days in advance they have to disclose their demonstratives for openings, I mean, having been to trial myself, I think that one day is sufficient. So we'll go with Defendants' proposal.

03:12:15 Next, we've got some language on Page 15, Paragraph 64. Is there an issue with this?

03:12:41 MR. WEINGAERTNER: Yes, Your Honor. Scott Weingaertner for the Plaintiff.

03:12:47 The concern we have is that the language here is not limited to closing or cross. And the term "similar representations" seems very vague to us. We don't think it needs to be included. Otherwise, we'd be agreeable.

03:13:01 THE COURT: All right. Well, I think I understand what "similar" means. We're going to have some blowups or highlights.

03:13:10 What is similar representation? Is it something that everyone knows would be a blowup or a highlight just called by a different name? A clip out of whatever; is that the idea?

03:13:19 MS. YING: I think that's right, Your Honor.

And as Mr. Weingaertner noted, I think this is right. This really only applies to opening and direct demonstratives, because the parties have agreed that we're not exchanging the closings and the cross-examination ones. So that's really where this applies to.

And I'll just note for the Court, I think this is also duplicated in Paragraph 119. It's the same thing.

THE COURT: Yeah. Yeah, Page 29, Paragraph 119.

So this is fine. I don't expect we're going to have some new-bangled type of demonstrative that you've never seen before --

MR. ROSENTHAL: Standard stuff.

THE COURT: -- in an exhibit. Okay.

All right. We'll adopt Defendants' proposal.

Page 16, Paragraph 69. What's the problem there?

MR. ROSENTHAL: Your Honor, as we understand it, the way -- the way we understand the practice to work -- and we're happy to be corrected if we're wrong -- if they have a witness that they want to bring up in rebuttal, we've disclosed our case during discovery. They need to have disclosed that witness now. They don't get to come up with an unanticipated witness for rebuttal.

If there's something that they need for impeachment, that's a different story. They're trying to

reserve the right to bring new witnesses that have not been disclosed on their witness list for rebuttal.

THE COURT: Okay. Counsel, is that what you're trying to do?

MR. WEINGAERTNER: No. We're not trying to do that. So I don't know that there's a dispute here.

THE COURT: Okay.

MR. ROSENTHAL: So I don't think it would include the words "or rebuttal" then.

THE COURT: Okay. So we're not going to include the words "or rebuttal" then? Is the idea that you might need to recall a witness that's already been on the stand?

MR. WEINGAERTNER: There may be depositions. Certainly no witnesses that are undisclosed that we would bring.

MR. ROSENTHAL: That's our only issue.

THE COURT: Okay.

MR. ROSENTHAL: So I don't think we need the word "rebuttal." Of course, if they want to recall someone that has been disclosed, that's not a problem. So I don't think -- this paragraph, which is dealing with undisclosed witnesses, shouldn't apply to rebuttal.

THE COURT: Okay.

MR. WEINGAERTNER: It's fine with us.

THE COURT: Okay. We'll take it out.

03:15:37 All right. Where are we with the next dispute, which is Paragraph 70 and Paragraph 81?

03:15:46 MS. YING: Your Honor, I think I could probably provide some clarification on at least 70. So the issue, at least with our language, all we're trying to say is the parties have exchanged deposition designations. They've made it into the Pretrial Order.

03:16:00 The reason that we have the language of if somebody all of a sudden becomes unavailable, for example, if a witness is sick or can't come to trial, I think that's -- I think, in most circumstances, you know, the parties can agree that, Look, this person was supposed to come live. They can't. So we'll do deposition designations of them. And that's what we're just trying to preserve here for.

03:16:22 I'm not sure that there's a dispute about that part, but I think that's what we were intending to do with our language.

03:16:30 THE COURT: So what's the dispute?

03:16:32 MR. PADRO: Your Honor, John Padro. I'm not sure what this actually contemplates. To the extent we have designations, they're already in. I'm not aware of any other deposition that might need to be designated, so I'm actually not sure why they're --

03:16:47 THE COURT: Are you saying that the witness that

03:16:48 might be live and you haven't designated?

03:16:51 MS. YING: Correct, Your Honor. So we have two.

03:16:52 We have John Oberheide and Ben Murray, both of who are

03:16:55 witnesses who are our witnesses. So we did not do

03:16:58 affirmative designations for people that we were intending

03:17:01 to bring live to trial because we wouldn't need to do that

03:17:03 normally.

03:17:04 In the off chance event, and no one is expecting

03:17:07 this to happen, but let's say something happens and

03:17:09 someone's unable to attend trial because they're sick or

03:17:12 whatever; they can't get on a plane and come here. This is

03:17:14 sort of what we are trying to make sure that we would still

03:17:16 be able to do. And we, obviously, would confer with the

03:17:19 other side if this happened, you know, and work that out to

03:17:23 the extent --

03:17:23 THE COURT: But you, standing here today, have

03:17:24 no reason to think that either of those witnesses will not

03:17:27 come to trial?

03:17:28 MS. YING: That's correct, Your Honor.

03:17:30 MR. PADRO: That's fine with us, Your Honor.

03:17:32 THE COURT: Okay. We'll adopt Defendants'

03:17:34 language subject to the discussion we just had on the

03:17:37 record.

03:17:46 On the issue -- oh, so let's turn to 81. That's

03:17:52 the same thing, so we'll include that language; right?

03:17:55 MS. YING: That's correct, Your Honor.

03:17:56 THE COURT: Okay. And as long as we're talking about deposition designations, I just wanted to remind counsel that if the exhibit numbers discussed during the deposition video clip are different than the trial exhibit numbers, that I'd like to have somebody read into the record how those two correlate, either before or after the video is played.

03:18:28 It's worked out really well for the parties in the last few trials we've had to have an associate that maybe wouldn't otherwise get any standup time during the trial read those in at the end. And I think the jury appreciates that as well.

03:18:44 So work together to figure out who's going to do it and then just read it into the record.

03:18:50 MR. ROSENTHAL: Thank you, Your Honor. We will.

03:18:52 THE COURT: Yeah. Page 18, Paragraph 75.

03:19:02 MS. YING: Your Honor, this is one where we provided -- we -- the parties conferred earlier before the pretrial conference, and then we reached out to the Plaintiffs and basically said, We could agree with their compromise. I think they said they were going to check.

03:19:18 So I'll just let the Court know where we are on this, and hopefully, you know, maybe they'd be able to respond. So I think where we are is that we would be

agreeable to witnesses only being called once. They would be called by the sponsoring party in their case-in-chief.

The non-sponsoring party would be able to go outside the scope of the direct on cross-examination. And that parties may play deposition testimony that is 30(b)(6) testimony in accordance with Federal Rule 32.

And then, obviously, there's a sentence on impeachment, which is always there. That's where we are, and I think that's consistent with both the Court's practice and the federal rules.

MR. WEINGAERTNER: Your Honor, we spoke earlier. It was productive. We've come around on that.

There's an open issue that they've proposed that we'd like to at least run by our client, but I think we're close on this, too, Your Honor.

THE COURT: Okay. That sounds good. What I will say is it's better if the parties agree. What's been discussed today is close, if not identical, to what I have in my notes that I would tell you had there been a dispute. So hopefully we can get agreement on it.

MR. WEINGAERTNER: Understood, Your Honor.

THE COURT: Yeah. The next dispute is on Page 22, Paragraph --

MR. ROSENTHAL: 95.

MR. PADRO: I think Your Honor may have already

resolved this one.

THE COURT: We already talked about that one. Thank you.

The next dispute is on Page 24, Paragraph 102. So I generally like to get folks, after they've done the cross, off the stand before taking the break. So I don't even think this will necessarily come up, but let me hear what Defendant has to say about it.

MS. YING: Your Honor, I was going to say exactly the same thing, which I think is in practice there is no gap between when cross ends and redirect starts. And this probably isn't an issue.

But the only point -- the reason that we were objecting to this is because Local Rule 43.1 does not actually say that. It actually says that the restriction on not speaking with your witness ends after the cross-examination of the witness is done. So it was just inconsistent with the local rule.

THE COURT: Well, I think either way, we just need to decide what we're going to do so that both sides are doing the same thing. So I don't think this is actually going to come up. If it does, I'm willing to entertain having a rule. I know the rule doesn't say that, but it also doesn't really contemplate redirect any way. And I think the idea behind this is that we don't have coaching of

03:22:10 the witness after something has happened on cross.

03:22:12 So does anyone think it would be legally wrong for me to say there shouldn't be discussion between the attorneys and the witnesses after cross begins?

03:22:20 MR. ROSENTHAL: Court's discretion, Your Honor.

03:22:22 MR. WEINGAERTNER: No, Your Honor.

03:22:23 THE COURT: Okay. Great. So that's what we'll do.

03:22:25 We will adopt Plaintiff's proposal in the Pretrial Order.

03:22:30 Dispute Number 10 is on Page 28, Paragraph 116. We'll adopt Defendants' proposal that the trial exhibits only have to be disclosed one day. I mean, this is going to be a five-day trial. We're only going to be hearing evidence four of the days. Things are going to be happening fast.

03:22:55 I think it's better to do it the night before, rather than to have people try to change, and then we're disputing the morning of trial whether or not they changed in time and whether there's good cause. So we'll just have them disclosed the night before.

03:23:11 MR. ROSENTHAL: Your Honor.

03:23:12 THE COURT: What's the story -- yes.

03:23:13 MR. ROSENTHAL: I thought I might interrupt before you get to the footnote because it's a long one.

03:23:14 THE COURT: Yes.

03:23:16 MR. ROSENTHAL: I think the parties are very close, if not in agreement. We had a great discussion earlier today where we set forth a procedure whereby I think later this week we'll give them a much narrower list of authenticity and foundation objections. Based on that, the parties, I think, next week will exchange a list of 250 each above the joint exhibits. And then we'll be all set. So I think we are all set with that.

03:23:42 MR. WEINGAERTNER: Yes.

03:23:43 THE COURT: Okay. That's great. So we're going to delete Footnote 4. The parties have discussed a way to get this whittled down.

03:23:49 So what about the timing of providing any objections to trial exhibits?

03:23:59 MR. ROSENTHAL: What the parties have agreed -- at least the proposal, I think, agreed is that we have the objections that are written down in the Pretrial Order. We are going to take a bunch of authenticity and foundation objections off, and, of course, we'll take whatever else we can off. But there's no set time to remove anything else.

03:24:17 We will abide by the 24 hours before exchanges and meet and confers to narrow any objections at that time.

03:24:27 THE COURT: Okay.

03:24:27 MR. ROSENTHAL: Sort of come on an as-needed

03:24:32 basis to make sure that nothing comes before the Court
03:24:34 without having been discussed in advance.
03:24:37 THE COURT: Great. So does everybody know what
03:24:38 we're doing, or is this dispute about 7:00 p.m. versus
03:24:41 9:00 p.m. something I need to weigh in on?
03:24:43 MR. ROSENTHAL: I'm sorry. Are you talking
03:24:45 about Paragraph 116?
03:24:47 THE COURT: Yeah, there's a --
03:24:48 MR. ROSENTHAL: Oh, I think that rises and falls
03:24:50 with earlier in 116. In other words, I think that if you're
03:24:53 going with Defendants' proposal on one day, you would go
03:24:56 with Defendants' proposal on the 9:00 p.m.
03:24:58 THE COURT: Yeah, because we're going to
03:25:00 disclose it -- the objections at 7:00 and then --
03:25:03 MR. ROSENTHAL: Earlier that day.
03:25:04 THE COURT: Yes.
03:25:04 MR. WEINGAERTNER: Agreed, Your Honor.
03:25:05 THE COURT: All right. Perfect.
03:25:06 MR. ROSENTHAL: So sorry. I was confused.
03:25:07 THE COURT: No, it's fine.
03:25:10 MR. PADRO: And can I add just one more thing on
03:25:11 the -- I know there's a proposal we had proposed. There's
03:25:14 some -- I think there's some language about how those
03:25:15 objections come out, and I think that's still something we
03:25:18 need to sort out.

MR. ROSENTHAL: Yeah. The parties will work out --

MR. PADRO: We'll work it out. We'll get it to you.

MR. ROSENTHAL: How we resolve any resolved authenticity and foundation objection, how we actually present that or don't present it, we'll work that out.

THE COURT: Okay. Perfect.

All right. Page 31, Paragraph 128.

So this is going to be Defendants' proposal as well. But I'll just say this, if the parties want a fact, or an admission or a portion of a pleading read to the jury, I will read that. The parties should meet and confer and figure out what the objections to that are, and we'll work out the objections the morning it's going to get read. And what I will do is I will read it in accordance with Third Circuit Model Jury Instruction 2.5.

And so that also pertains to earlier in the Pretrial Order, Paragraphs 20 and Paragraph 48, which talk about uncontested facts. If you want uncontested facts read or anything like that, it's all going to come in pursuant to the procedure I just said.

MR. WEINGAERTNER: Yes, Your Honor.

MR. ROSENTHAL: Sure.

THE COURT: All right. We talked about the

03:26:49 length of trial, which is on Pages 32 and 33, Paragraphs 133 and 134.

03:26:58 Just to be clear, that 11 hours includes all openings, closings, all examinations, deposition designations and any time charged to a party for the Court's resolution of a morning dispute over exhibits or testimony.

03:27:17 And we talked about the schedule.

03:27:22 Turning to Paragraph 147.

03:27:36 MR. ROSENTHAL: Your Honor, on this issue, again, we've had some what I think are productive discussions on source code. Cisco, thankfully, is a company that does not need to seal the courtroom when we talk about source code, thank goodness.

03:27:50 But we also don't want the entire source code put into evidence if it's not discussed. We just want the pieces that are discussed with witnesses, that's what goes into evidence. That's what gets admitted. And that way we don't have to seal anything.

03:28:04 THE COURT: Right. Counsel, are you working on that with them?

03:28:07 MR. WEINGAERTNER: We are. Yes, Your Honor.

03:28:08 THE COURT: Okay. Great.

03:28:09 I mean, I don't know that the jury needs hundreds of pages of source code. I don't know what they would do with it. So we should have enough in there that we

03:28:18 need to have in there, but that's it.

03:28:20 MR. ROSENTHAL: And I'm very confident if they want to have like a little context, like it's not just the lines that are being discussed, we have no problem with that. We just don't want swaths of code that hasn't been discussed put into evidence because then we need to talk about whether we need to seal.

03:28:34 MR. WEINGAERTNER: The compromise works for us.

03:28:36 THE COURT: That works for me, so let's get that worked out.

03:28:38 MR. ROSENTHAL: We will, Your Honor.

03:28:39 THE COURT: All right. And then Page -- as long as we're talking about sealing, I'll just remind everyone, again, if there's going to be a request to seal the courtroom at any point during the trial, I need to know about it in the morning before the jury comes out so I don't just get caught unaware that somebody jumps up and says, We need to seal the courtroom right this second.

03:29:00 So notify me it's about to happen. You will have already met and conferred with the other side about it and gotten their position. And then we'll try to discuss, if we do need to seal, ways that we can either minimize the sealing, or not seal at all and just have exhibits or whatever not put up on the Elmo. So that's it on sealing.

03:29:21 All right. Then we had a dispute at Page 38,

03:29:36 Paragraph 148. So here's what I'll say about this: We're talking about certain things that are said in Exhibit 18 to the Pretrial Order.

03:29:51 So this document as a document is not going to get marked with an exhibit sticker and entered into evidence. That said, Stipulations Number 1, 2 and 4, maybe they need to be tweaked a little bit, but I'm open to reading them as stipulations of fact to the jury. If they could be -- I understand what was meant in here by both sides.

03:30:25 If Defendant thinks there needs to be some additional context that doesn't go against what they agreed to in this document, that's fine. And so work to meet and confer about what I should read to the jury, and 1, 2 and 4 can get read in this form or a substantially similar form.

03:30:41 Three, I do read as a guardrail. Defendants are not going to assert what it promises not to assert in three. And if, in fact, that gets violated, then we'll figure out how to deal with it. But it shouldn't be violated.

03:30:56 Are we good on that?

03:30:56 MR. ROSENTHAL: That solution works fine, Your Honor.

03:30:58 MR. WEINGAERTNER: That works, Your Honor.

03:30:59 THE COURT: Okay. Great.

03:31:05 All right. Ensnarement. I'll hear argument on

this.

I guess it's Plaintiff's objection, so we'll hear from Plaintiff first.

MS. PELLETIER: Thank you. Would you --

THE COURT: Either way.

MS. PELLETIER: Sure. So, Your Honor, the next set of issues boil down, at a high level -- I'm happy to walk through each issue -- boil down to the fact that we're at a point, obviously, eve of trial where we are supposed to be narrowing the issues. And despite the fact that we were supposed to be narrowing the issues, we have seen Defendants seek to assert a new defense, produce a new document never disclosed. And we believe it's very prejudicial and unfair that Defendants would be allowed the opportunity to present with respect to the specific defense of ensnarement, ensnarement at trial. It has not been the subject of any expert discovery, and it has not been the subject of any expert opinion.

And I'm happy to walk through any of the details that you see.

THE COURT: Well, let's go back to the beginning. So it certainly was in their answer; right? It says, Sixth Defense. Ensnarement. Yes?

MS. PELLETIER: Yes, Your Honor.

THE COURT: Okay.

03:32:28 MS. PELLETIER: It does name the defense ensnarement in the answer, but I would submit that a one boilerplate sentence of "Plaintiff is barred by the doctrine of ensnarement" is not sufficient to put us on notice as to the bases, factually or legally, as to what their theory is of ensnarement.

03:32:43 THE COURT: So let me ask you this then. So then fast forward from the answer. Then we got to some contentions presumably.

03:32:51 And did you ask them why they said they didn't infringe, and did they say anything that sounded ensnarement like?

03:32:58 MS. PELLETIER: So we actually had an interrogatory, Your Honor, that we posed on Defendants, Interrogatory Number 3, that dealt with their noninfringement contentions. They did not raise any theory of ensnarement in response to that interrogatory. And we do not have noninfringement contentions in this case other than that interrogatory, but it was not --

03:33:15 THE COURT: So I don't have that before me, but you're saying it doesn't include ensnarement. Do they say they don't infringe under the doctrine of equivalents?

03:33:23 I mean, I'm trying to -- I don't even have this interrogatory, so these things are not normally filed.

03:33:29 MS. PELLETIER: Sure. And I do have a copy if

Your Honor would like one.

THE COURT: Yeah, that would be great. By the way, they say they brought it up in response to Rog 5, too. Do you have Rog 5, so I can see that?

MS. PELLETIER: It's within the same set, Your Honor, and I'm happy to address that. But I'll wait.

THE COURT: Yeah. Why don't you -- you can approach.

MR. ROSENTHAL: Thank you.

THE COURT: So this is 3. Did you give me 5, too?

MS. PELLETIER: It's a full set, Your Honor.

THE COURT: Oh, okay.

MS. PELLETIER: So I can point you to --

THE COURT: Give me one second just to read it here.

So, all right. So I see a section titled "Ensnarement" on Page 57.

MS. PELLETIER: Yes, Your Honor, which is in large part my discussing discovery deficiency issues that have since been resolved.

I want to point you, though, to Page 59. It's the second full paragraph. And even this, Your Honor, this is the most detail that we get in terms of a disclosure of any sort of alleged ensnarement. And even here, Defendants

do not limit themselves to any particular prior art or any particular contention.

It states, "Against this backdrop, examples of prior art that may be ensnared include." And, for example, CosmoKey's doctrine of equivalents allegations for limitation 1(d). These are mere examples. They're not even limited.

And the only other portions of disclosures that Defendants point you to in the Pretrial Order are four paragraphs of Dr. Jeffay's expert reports, which I do have with me as well if you'd like to take a look, Your Honor. But I can tell you that none of the four paragraphs are any disclosure or have anything to do with ensnarement. The word ensnarement is not even used. Neither is ensnare.

And so those paragraphs relate to two topics. Two of the paragraphs in Dr. Jeffay's rebuttal report on noninfringement, which is where you would expect to see a discussion of ensnarement. These paragraphs do not discuss ensnarement, but instead discuss an entirely separate issue, which is Defendants' contentions that CosmoKey made certain statements in IPR proceedings against Cisco years ago. And that these statements somehow allegedly mean that CosmoKey disclaimed certain claim scope. Disclaimer is not ensnarement.

When we move to the two paragraphs that

Defendants point you to in Dr. Jeffay's reply report on invalidity, so not even noninfringement, they are discussing two paragraphs in the "Overview" section of his report that pertain to Defendants' separate '273 noninfringement defense and their alleged prior art systems.

And so none of these paragraphs provide us any notice or any idea of the factual or legal bases for their ensnarement theory. And, in fact, they bring up separate prior art and limitations than what's even mentioned in that one paragraph of their Interrogatory 5 response.

And so we're sort of left here needing to guess at the eve of trial as to what this defense could mean and with no expert disclosure or opinion on these subjects.

THE COURT: All right. I understand.

Thank you.

MS. PELLETIER: Thank you, Your Honor.

THE COURT: Here's what I have to say about this: So the ensnarement defense is properly in the case. You can have a seat. It was in the answer. It was in the contentions.

I understand Plaintiff's Complaint here today to be that Defendants' experts needed to provide an opinion on the ultimate issue of ensnarement in order to present their opinions to the jury. And while it is true that we let experts provide an ultimate opinion on infringement and

validity to the jury, I don't think that's necessarily required in order to let the case go to the jury.

So we will include ensnarement as an advisory jury question. We will instruct the jury on ensnarement. Defendants' experts can testify to exactly what they testified in their expert report, but no further, including I don't think I should be hearing ensnarement come out of any expert's mouth sitting on the stand since, as counsel pointed out, it wasn't in the report.

And then we'll hear in the closing argument how counsel thinks it all fits together on the issue of ensnarement.

Does anyone think they want to add anything to what I've said?

MR. ROSENTHAL: No, Your Honor.

MR. WEINGAERTNER: No, Your Honor.

THE COURT: Okay. And does everybody agree that it's the Court's role to determine the issue of ensnarement, but that it's not legal error to present it to the jury for an advisory verdict?

MR. ROSENTHAL: We do, Your Honor.

MR. WEINGAERTNER: Agreed, Your Honor.

THE COURT: Okay. Great.

Pages 41 to 43 have to do with obviousness combinations. So we took a look at this one carefully.

03:41:26 MS. YING: Your Honor, I actually think that -- so I think we can tell the Court that the one about Dug Song on 43 is moot.

03:41:33 THE COURT: Okay. So there's -- all right.

03:41:35 MR. ROSENTHAL: We're not bringing Mr. Son.

03:41:37 THE COURT: Mr. Song's not coming.

03:41:38 MS. YING: That's been resolved. And then we -- and during our meet and confer that we talked about a proposal for narrowing both the asserted claims and our invalidity with specific obviousness combinations. I believe it's under consideration --

03:41:50 THE COURT: Okay.

03:41:50 MS. YING: -- by the other side right now. So this may also be a moot issue.

03:41:53 MR. ROSENTHAL: I'm so sorry to have popping up heads. Here, just to add a little bit of context to that --

03:41:58 THE COURT: Yeah.

03:41:58 MR. ROSENTHAL: -- we have proposed, among the claim narrowing and prior art narrowing, that we limit ourselves to, I think, a total of five obviousness combinations. I can say with a hundred percent certainty that every one of those combinations is going to have been explicitly stated in the report, so this issue will fall away.

03:42:17 THE COURT: Okay. All right.

03:42:18 In light of that representation, it seems like this is one we should put off.

03:42:22 What do you think, Counsel?

03:42:23 MR. WEINGAERTNER: Agreed, Your Honor.

03:42:23 THE COURT: Okay. All right. I appreciate it.

03:42:27 Okay. We also talked about dispute, in my notes, Number 19. That was Mr. Song. We resolved that. He's not coming to trial.

03:42:49 Now, we've got a dispute on Pages 44 to 46, Paragraph 157.

03:43:14 All right. What's going on with this?

03:43:17 MS. PELLETIER: Sure, Your Honor.

03:43:18 THE COURT: We'll hear from -- we can hear from Plaintiff first.

03:43:21 MS. PELLETIER: I'm happy to speak to this issue, Your Honor.

03:43:22 THE COURT: Right. Can I have this document or what does this document look like, just so I can see it?

03:43:27 MS. PELLETIER: Sure. And, unfortunately, I only have one copy per the Protective Order.

03:43:32 THE COURT: That's fine. I just want to lay eyes on it.

03:43:35 MS. PELLETIER: This is the document, Your Honor.

03:43:36 THE COURT: Okay. Do you want to just bring it

03:43:38 up here so I can just see what this looks like?

03:44:08 Okay. Well, I'll say for the record that I'm paging through it. It says "Highly Confidential Source Code" on it. It's got a lot of stuff on here that is going to be Greek to anyone that hasn't been litigating this case.

03:44:27 Let me hand it back to you.

03:44:41 So, Plaintiff, why don't you explain to me what the issue is here.

03:44:45 MS. PELLETIER: Sure, Your Honor. Just for some context, throughout the litigation we've requested that Defendants disclose all factual --

03:44:51 (Reporter clarification.)

03:44:51 MS. PELLETIER: Throughout the litigation, Your Honor, we've asked Defendants to provide fulsome responses to interrogatories, including an Interrogatory 1, which you have before Your Honor, related to changes between versions of products. They continuously refused.

03:45:09 Same thing with asking them to respond to Interrogatory Number 5 with the full factual legal basis for the defenses. We had a hard time with that as well.

03:45:18 And, again, we're on the eve of trial. We had a laid out schedule for Pretrial-Order-related disclosures. This document before you, Your Honor, was never cited to in an expert report, never before provided to us. And until April 29th, the night before our Pretrial Order was due, and

03:45:39 appeared on an exhibit list and was in the midst of a document production.

03:45:45 We do not understand -- know what they intend to do with this 327-page document because it was never discussed by any expert or cited to by anyone. As you see, Your Honor, it relates to source code, the subject matter of expert opinion. There is no expert opinion on this.

03:46:01 And the change log, which is before you, would have been directly responsive to our Interrogatory Number 1 requesting changes between versions of code and products.

03:46:12 Now, I will also highlight that if you look at the dates within this change log, the change log deals with changes to source code, the underlying code of which has not been provided in this litigation. It predates any contention from Defendants as to when their alleged prior system was even in existence. And so we do not know what they intend to do with this document.

03:46:38 We asked, in an effort to try to work this dispute out, what they were intending to do with the document. They only said that they could use it as they could any other exhibit.

03:46:47 And we just submit that at this point it is highly prejudicial considering it was only first disclosed on April 29th.

03:46:54 THE COURT: So you disagree with them that this,

03:46:57 the underlying file of which this document appears to be a
03:47:01 printout, was on a computer that they gave to you to review?

03:47:09 MS. PELLETIER: The computer that they gave us
03:47:10 to review, Your Honor, included more than 1 million source
03:47:13 code files. What I understand from this excerpt is that
03:47:18 it's an excerpt of a change log.

03:47:20 And just for context, because I think it's very
03:47:23 important, this is 327 pages of tens of thousands of pages
03:47:28 of change log. And so that's essentially putting a burden
03:47:32 on CosmoKey to find a needle in a haystack that defense may
03:47:36 or may not use in some undisclosed way to support
03:47:39 themselves.

03:47:39 Now, it is our position that it should have been
03:47:43 identified -- if -- to the extent they were going to be
03:47:45 relying on it, it should have been identified in invalidity
03:47:50 contentions, which it was not. It should have been
03:47:52 identified explicitly in response to Interrogatory Number 1,
03:47:55 which we asked them repeatedly to supplement. And at
03:47:58 minimum, it should have been cited by an expert or discussed
03:48:03 by an expert, to the extent that it was going to be part of
03:48:05 this case, in which case we would have had an opportunity to
03:48:08 respond.

03:48:08 THE COURT: All right. Thank you.

03:48:09 Let's hear from Defendants. How are we going to
03:48:11 use this document?

MR. SCHARN: Sure. So -- and first of all, Nathan Scharn on behalf of the Defendants.

So this document details the changes that were made to the code throughout 2010. And as Your Honor has probably picked up on, there's a lot of debate about what was added and when to the product for purposes of showing that it's been functionally the same since 2010, which predates the filing of the asserted patent by more than a year.

So this shows when various modules were added. I want to clear up -- and, certainly, it looks like Greek. We would not present it without providing a translator, so that is for certain. We also would not present it through an expert that did not cite to it affirmatively, one of our experts.

So there are a couple of statements made about it not being made available, but I think we've cleared that up. We made it available for inspection since April of 2023. CosmoKey has been in to review the source code about 30 times since then, and we would have given them more times if they asked for it.

There's a statement that this wasn't cited in response to Interrogatory Number 1, and that's actually incorrect. In our June 7, 2024 supplemental interrogatory response, we cite to

03:49:28 data/sourcecodechangelog/gitlogs/server/master.txt.

03:49:36 THE COURT: Stand by.

03:49:40 MR. SCHARN: I believe in your copy, it's
03:49:42 Page 15.

03:49:50 THE COURT: And how many pages is that file?

03:49:54 MR. SCHARN: I'm not certain, off the top of my
03:49:56 head, how many pages that particular file is.

03:49:58 THE COURT: But this is a subset of this?

03:49:59 MR. SCHARN: It's a subset of that. That's
03:50:01 correct.

03:50:01 THE COURT: So it's 327 pages. And -- well, let
03:50:07 me just -- before you go on, let me just ask Plaintiff: So
03:50:12 they refer to this in their rog response.

03:50:15 Did you have access to this file?

03:50:17 MS. PELLETIER: We had access to the git log,
03:50:19 Your Honor, but that was the point I was trying to make
03:50:21 before. I certainly would not -- never want to mislead you.

03:50:23 They cited to the entire change log, which
03:50:27 can -- which is tens of thousands of pages. This is a
03:50:31 particular excerpt, which they only provided us a hard copy
03:50:34 of on May 1st. And the procedure under the Protective Order
03:50:38 is that they need to print the source code to produce it
03:50:42 with a Bates number. And so that was not provided until
03:50:44 May 1st.

03:50:45 THE COURT: Okay.

03:50:46 MS. PELLETIER: So all they did with this Interrogatory Number 1 is cite to the entire git log.

03:50:49 THE COURT: Okay. But when you said that there were millions of files on the computer, they had three files that were listed in this rog response; right?

03:51:00 MS. PELLETIER: No, Your Honor.

03:51:00 THE COURT: Okay.

03:51:01 MS. PELLETIER: The source code computer had the git logs that are separate from the over million files of source code on the same --

03:51:09 THE COURT: But this isn't -- but this is a particular file. This is gitlog/android/master.txt. That's one file; right?

03:51:19 MS. PELLETIER: It's one git log of tens of thousands of pages.

03:51:22 THE COURT: Okay.

03:51:24 MS. PELLETIER: And, again, I really want to echo that this was not discussed or relied on by an expert in this case.

03:51:32 THE COURT: Okay. Well, that was going to be my next question.

03:51:34 So why don't you walk me through that. And I don't know that I've got the expert reports in a format that it's easily accessible to me now.

03:51:42 MR. SCHARN: Certainly. So this document is not

03:51:44 discussed in our expert's reports affirmatively, and they would not discuss it. We would not exceed the scope of our expert's reports in presenting it.

03:51:53 That said, there are fact witnesses whose names show up in this document as, you know, committing a certain source code file. And they might be able to talk about it. That would be one way that it could come up.

03:52:05 Now, more specifically, there are three particular change logs which are sort of more detailed versions of what changed that Dr. Jeffay, our technical expert, has cited in his reply report. And you can see the correlation between those change logs and this document. This document sort of functions as like a Table of Contents to the various change logs.

03:52:29 So this would contextualize, for example, these three change logs that Dr. Jeffay does cite. And I can point you to the parts of that document where that shows up, if that's helpful.

03:52:41 THE COURT: That's helpful.

03:52:42 MR. SCHARN: Sure. So DTX 31 is one of the change logs I'm referring to from Dr. Jeffay's report. The reference to that one is at -- in a PDF, it would be Page 187. I don't know if there are page numbers on there.

03:52:57 THE COURT: Where -- should I pull it from the docket?

03:53:01 MR. SCHARN: Oh, sorry. In the change log -- oh, sorry. You would like the DTX --

03:53:04 THE COURT: Yeah. Can you tell me? I want to see where in the expert report this is discussed.

03:53:09 MR. SCHARN: Sure. I do not have a copy of Dr. Jeffay's reply expert report, but we're happy to supply one.

03:53:21 THE COURT: Well, I'm sure if you can just tell me where it is on the docket. Things don't -- things are not organized by the court in a way that I could easily pull them. I only have it to the extent that somebody filed it with something. I assume -- I know I've laid eyes on it at some point.

03:53:33 MR. SCHARN: Oh, I know -- sorry. I know where it would be, Your Honor. I need to get the docket numbers for you.

03:53:38 THE COURT: Okay. Yeah, why don't you grab it.

03:53:41 MR. SCHARN: Judge Burke just denied a motion to strike these revision logs, so it's not that one.

03:53:47 But in the papers referenced in DI-484, it was that Order where Judge Burke denied the motion to strike these revision logs from Dr. Jeffay's reply report.

03:54:02 THE COURT: Okay. Why don't you just take a moment and confer with your team and get me a DI for where the report is.

03:54:09 MR. SCHARN: Thank you, Your Honor.

03:54:32 THE COURT: I found it. 424, Exhibit 1. That's
03:54:36 Dr. Jeffay's reply report.

03:54:39 MR. ROSENTHAL: That's the one, Your Honor.

03:54:40 THE COURT: Yeah. So why don't you tell me what
03:54:43 paragraph discusses something that has to do with this
03:54:45 exhibit.

03:55:18 (Discussion held off the record:)

03:55:27 MR. SCHARN: Okay. So it's going to be
03:55:49 Paragraph 33.

03:55:52 THE COURT: All right. Stand by.

03:55:54 MR. SCHARN: And then Paragraph 34.

03:55:57 THE COURT: All right. Stand by. I'll read.

03:56:20 So what's the document he's citing in these
03:56:23 paragraphs?

03:56:23 MR. SCHARN: These are the revision logs that
03:56:26 are more specifically showing what code was added. So then
03:56:30 the document that we're talking about that's part of the
03:56:32 Pretrial Order -- and I apologize. This is why I didn't
03:56:34 have all of these printed for you. This is a longer
03:56:37 document that's essentially a Table of Contents to the
03:56:40 revision logs that shows when various code modules were
03:56:44 added.

03:56:44 THE COURT: So this is a different document than
03:56:46 the document he's relying on?

03:56:48 MR. SCHARN: That's correct. And we would not introduce the document that's at issue here through Dr. Jeffay --

03:56:53 THE COURT: Okay.

03:56:53 MR. SCHARN: -- affirmatively at least --

03:56:55 THE COURT: Okay. Understood.

03:56:57 MR. SCHARN: -- unless it's the scope of cross or something. That would be the only way. But we're not going to affirmatively introduce a document that he did not speak to.

03:57:03 What could happen is, you know, for example, their invalidity expert could say something that is contradicted by what's in this revision log or fact expert like Mr. Oberheide who committed many of these code changes could explain, Yeah, this is the context. I need to tell you the date that I added this various -- you know, this specific piece of code.

03:57:27 THE COURT: Okay. Well, we're getting closer to understanding what's going on here.

03:57:34 Let me hear from Plaintiff again now. So now that you're hearing their experts are not going to talk about it, and you're hearing that it was part of something that you had access to, what's your response to that?

03:57:47 MS. PELLETIER: My response, Your Honor, is that if they were going to be using that document in relation to

the three paragraphs in Dr. Jeffay's report here, then that document should have already been printed when this report was furnished to us. And it was not. It was not identified at that time.

And I think it's really important to note as well that to the extent that they are going to use this 327-page document with Mr. Oberheide, Mr. Oberheide was deposed last summer. We did not have the benefit of questioning him on this document that was not identified, or provided or copied until May 1st.

And so the fact that they're pointing to these specific revisions, these documents are emails, automated emails that are sent when certain changes are made to the source code. And the fact that they are different from this, yet related, that document should have been identified in relation to these three paragraphs months ago, not on the eve of trial, not after we exchanged exhibit lists and stamped copies of trial exhibits. And not the night before the Pretrial Order, and certainly not after Mr. Oberheide's deposition.

THE COURT: Okay. Counsel.

MR. SCHARN: Your Honor, on the point about printing the source code for them, the way that this worked was that they were able to come and review the source code and request prints of the things that they thought were

03:59:06 important. Even though we identified this for them in an interrogatory response in June, and Mr. Oberheide's deposition was not until several months later, they elected not to have it printed and apparently did not intend to ask him about it. It's not our job to tell them exactly how they should conduct Mr. Oberheide's deposition. And it's also not our job to affirmatively put on our case through Mr. Oberheide at his deposition. That's something we do in front of the jury at trial.

03:59:34 This was fairly disclosed, fairly made available, identified in interrogatory responses. And, you know, it's, frankly, at the core of the case -- not -- the document isn't necessarily at the core of the case, but when changes were made to the code in 2010, what was changed and what is fundamental to really the core issue of this case, which is that we have been doing the same thing since well before their patent was even applied for. And so this is just one more piece of evidence that shows when we added this functionality, when our invention came together in a functioning embodiment.

04:00:14 THE COURT: Okay. And let me ask you this: The 327 pages, is that extracted from some type of organized thing or is it just an excerpt of 320 pages of the middle of this document?

04:00:35 MR. SCHARN: I would have to double-check that,

Your Honor.

THE COURT: Okay.

MR. SCHARN: I believe it's -- you know, yeah, I would have to double-check that. I want to make sure I don't misrepresent anything.

THE COURT: So here's what I'm going to say about this one: I'm not going to exclude the information. I'm still thinking about what form it should be presented in because it's -- I don't think we can confirm here today that this document is what it purports to be based on the information in front of me.

So if Plaintiff needs an additional opportunity to review it in its native format, I think that's something that I would consider. If Plaintiff wants it presented in its native format to the jury as opposed to whatever printout you're offering now, that's also something that I would consider. But it's not going to get excluded.

So beyond that, it almost feels like you should be able to work out the rest of the details.

Does anyone have anything they want to say about it?

MR. SCHARN: Defendants would be happy to accommodate either of those scenarios.

MS. PELLETIER: Your Honor, if I may just share a continuing concern on our part.

THE COURT: Yes.

MS. PELLETIER: So, you know, Mr. Scharn's representation that it would be used limited to the three revisions in Paragraphs 33 to 35 of Dr. Jeffay's report, that's not something that was shared ahead of time. We still have the concern that, you know, just allowing the 327-page document in its entirety to be used without any limitation and without limiting to the subject matter that was disclosed in Dr. Jeffay's report, that's still something that still concerns us.

THE COURT: Well, I think you could get it worked out based on his representation today. I don't understand him to go back on it. But I can think of, just off the top of my head, things we can deal with it, including showing the native file to the jury, and then admitting just the little subsets of code that correspond to this as sub-exhibits, something like that. I think we can figure out a way to do this that won't prejudice Plaintiffs.

MR. SCHARN: And I do just want to clarify, I didn't intend to state that it would be only those three things. I think those are the most likely candidates, but I just want to make sure that there's no --

THE COURT: All right. Now, you need to meet and confer, and I'll hear any more objections on other things later.

Okay?

MR. SCHARN: Sure.

MS. PELLETIER: Thank you, Your Honor.

THE COURT: Yeah. All right.

Before we get to the motions in limine, let me just go over a couple more things I wanted to tell you. The first is that with respect to the trial transcripts, I need the parties to make sure they submit any necessary corrections within two weeks after the conclusion of the trial.

MS. YING: Your Honor, on that point --

THE COURT: Yes.

MS. YING: -- can we do two weeks from when we get the final transcripts from the court reporter because we don't always get them.

THE COURT: That's fine.

MS. YING: Okay.

THE COURT: Yeah. We already talked about sealing of the courtroom.

We'd like the parties to get us electronic versions of all the trial exhibits. It probably would be better, if you're reducing them down to 250 each, if you waited until we did that to get them to us. As long as we have them by the first day of trial, that's fine. How you get them to us is up to you. You can either send us the

shared drive link, or bring over a junk drive or I don't even know what they're called nowadays, but any of that is fine. And the exhibits should all be in PDF form with the file names being PTX or DTX and then the number of the exhibit.

The parties need to work together to make sure that by the time we send the case back to the jury that we have a binder of only admitted exhibits that go back to the jury room. If there are any native files or videos that were admitted into evidence, those can be loaded onto a clean laptop or a separate flash drive that we can send back to the jury as well.

Oh, I wanted to ask you about Paragraph 31 of the Pretrial Order just to make sure that I understand what we're doing. So only exhibits on the exhibit list are going to be introduced into evidence. Only exhibits on a party's list for a witness are going to be introduced in evidence. But the other side can use a document for impeachment that could get introduced into evidence during the cross-examination if that document is on the Pretrial Order exhibit list.

And then the part that I had a question about is where it says "impeachment exhibits, if not appearing on a party's exhibit list or joint exhibit list, shall not be admissible unless good cause is shown."

04:06:09 I was trying to think about what that good cause might be. The good cause isn't going to be because we want to surprise them with it; right?

04:06:14 MR. ROSENTHAL: I think that's cause. I don't think that's good cause.

04:06:17 No. I think you have it exactly right, Your Honor. In the ordinary course if a document is not on the exhibit list, it is not getting admitted into evidence. It could be used for impeachment, of course, but not admitted into evidence.

04:06:29 And unless something is out of the ordinary, that ought to be the rule. And I think that's what we were intending to capture here.

04:06:36 THE COURT: Okay. All right. We agree on that on your side?

04:06:38 MR. WEINGAERTNER: We agree.

04:06:39 THE COURT: And just as long as we're all on the subject, because this comes up every trial, we're not going to put anything up on the screen if it hasn't been admitted into evidence as well; right?

04:06:51 MR. ROSENTHAL: I agree, Your Honor.

04:06:52 THE COURT: Okay. You agree?

04:06:53 MR. WEINGAERTNER: Yes, Your Honor.

04:06:54 THE COURT: All right. I think that's the right way to proceed.

04:06:56 MR. ROSENTHAL: I do only because I haven't had the pleasure of trying a case in front of Your Honor, and maybe I should ask Ms. Ying, maybe she has the answer. But if you have any particular way that you like impeachment to go in terms of publishing the testimony or publishing the video that we need to be aware of that isn't otherwise known, I'd love to hear it. But I just don't want to run afoul of anything.

04:07:19 THE COURT: Well, here's what I'll say. We have tried -- you can have a seat.

04:07:23 MR. ROSENTHAL: Thank you.

04:07:23 THE COURT: We have tried different ways to make sure this is done appropriately, and no matter what we try, it always ends up going the wrong way. As I -- I know counsel in this room are all very experienced trial attorneys.

04:07:37 So if the parties agree, I'm okay with slapping the deposition transcript up on the Elmo before clearing it. That wouldn't be my preferred practice. And, in fact, as soon as somebody screws it up by not -- by putting up something that's not inconsistent, my rule would be you get one chance and then we're going to shut it down. So that's one way we can proceed if you agree.

04:08:05 The other way we can proceed is if somebody wants to do impeachment, they can say, I direct Court and

Counsel to Page 87, Line 3 of the deposition transcript, and then pause for a couple seconds to give opposing counsel a chance to object. And if I hear nothing, then I will say, Counsel, you may proceed. And then we can proceed with the impeachment.

Either of those ways is fine with me. I'm open to suggestions.

MR. ROSENTHAL: Well, I like the Wild West of your first approach, but only if opposing counsel is also good with it.

MR. WEINGAERTNER: I'm not willing to agree to that. I think either of those, including the second option, would work for Plaintiff.

THE COURT: Okay.

MR. ROSENTHAL: Well, that's what I meant. I'm sorry. I was being flip.

THE COURT: Right. Yeah.

MR. ROSENTHAL: I meant your first option, I think, is preferable to us. Give us a strike, and if we use that strike, then we'll go back to the more formalistic.

THE COURT: Counsel, you don't want anything popped up there?

Okay. Here's what we'll do then. In light of all this, what we're going to do is you're going to direct the Court and Counsel to it. And then if I say you can

proceed, you can pop it up on the screen.

How about that?

MR. ROSENTHAL: Thank you, Your Honor. And I assume video is fine as a --

THE COURT: Yeah. I do prefer that there actually is a question --

MR. WEINGAERTNER: Yes, Your Honor.

THE COURT: -- at the end of an impeachment, rather than just, You said this. I said this, and then you said this, and then I'm left wondering what the question is.

So if you could just take the extra step to say, Did I read that -- is that what happened or did I read that correctly, I prefer that.

MR. WEINGAERTNER: Yes, Your Honor.

MR. ROSENTHAL: Yes, Your Honor.

THE COURT: Okay. All right.

The parties snuck in here, and my clerk found it, to their witness list a couple pages of objections to witnesses.

Do we have to discuss any of those today?

MR. PADRO: I think -- Your Honor, I think those are all resolved now.

MR. ROSENTHAL: We think so, too, Your Honor. If there's anything left, we'll make sure that we raise it in lots of time.

04:10:04 THE COURT: Okay. And there was a discussion
04:10:07 about certain prosecuting attorneys maybe for inequitable
04:10:13 conduct.

04:10:13 Has that been all resolved?

04:10:16 MR. PADRO: I think it's been resolved.

04:10:17 MR. ROSENTHAL: Well, I think it has, too, only
04:10:19 that we don't have an objection to them bringing those
04:10:22 witnesses by deposition. We had objected because we thought
04:10:26 they were under their control. They said they are not.
04:10:28 That's fine.

04:10:29 THE COURT: So we're good to go?

04:10:30 MR. ROSENTHAL: I think so.

04:10:31 THE COURT: And we'll hear that at the bench
04:10:33 trial portion of the case?

04:10:33 MR. ROSENTHAL: Yeah. Well, and there are
04:10:35 portions of their testimony -- and we're about to have a MIL
04:10:39 on this issue, I think. But there are portions of their
04:10:41 testimony that are relevant to other issues in the case, and
04:10:44 I think that will be resolved by the MIL.

04:10:46 THE COURT: Okay.

04:10:47 MR. WEINGAERTNER: Agreed.

04:10:48 THE COURT: Okay. Great.

04:10:56 Deposition designations. The parties propose to
04:11:01 get any final disputes to me by 6:00 p.m. in the evening,
04:11:06 which is fine. If we're doing that, we'll try to get you a

ruling the next morning or on a break. But if it's something that you're planning on presenting the next day by video, you need to make sure that you build in time to revise the time for video.

So if you need -- whatever day you want a ruling, we need to have it early that morning or the night before. And then you get the ruling that day, and then that's where we'll be.

Does that make sense to everybody?

MR. WEINGAERTNER: Yes, Your Honor.

MR. ROSENTHAL: It does, Your Honor.

Oh, I'm sorry. Since I stood up for a second.

THE COURT: Yeah.

MR. ROSENTHAL: I assume that for the inequitable conduct bench trial that you don't want to sit through video deposition, but I'm happy to do that.

THE COURT: It depends on how much it is. If it's five minutes, I'd rather just put it in the record while we're listening to it. If it's an hour and a half of your two hours of presentation, I would rather do that at home with some popcorn rather than sit here with you-all and then you-all can prep for the next day.

MR. ROSENTHAL: And if I was -- we'll be flexible in that regard. I guess my point is I didn't -- if we have an hour of deposition video, I would assume that for

04:12:19 something like that, we submit it. Maybe if there's a portion we want to highlight, we'll do that in our --

04:12:24 THE COURT: That's fine. That's fine with me. I mean, like I said, if it's like half an hour or less, we should --

04:12:30 MR. ROSENTHAL: Then we'll play it.

04:12:31 THE COURT: -- just watch it here just so we can have the record be clean.

04:12:35 Okay?

04:12:35 MR. ROSENTHAL: Thank you, Your Honor.

04:12:36 THE COURT: Okay. All right.

04:12:40 We talked about the trial date. The number of hours.

04:12:44 I'm going to plan to take the bench at 8:30, to the extent I'm ready to come out to preside over any disputes that we have. We'll bring the jury in at approximately 9:00 if we've got all the disputes resolved. If there are any disputes, we're going to have them by 7:00 a.m. that morning so that we can be ready to talk to you at 8:30. You know where to email the disputes.

04:13:14 We're going to run from approximately 9:00 to 5:00 each day. We'll do a 15-minute break in the morning, between 30 minutes and an hour for lunch and a 15-minute break in the afternoon. My goal every day is to try to get a little more than six hours of charged time in, and that

will ensure that we get done by Friday so that we can get the case to the jury.

And so that may mean we feel comfortable cutting them loose at 4:30. It may mean that we have to get a couple minutes. Something always happens and you can't predict it.

And having only once had the experience where we had to carry the jury over into the next week, I'm vigilant about making sure we get our required time on the record every day. In general, if we're sitting in the courtroom, someone is being charged for time.

And that includes the dispute conference that we'll have in the morning. Generally, I'll charge it to the loser of the dispute, but I may split it up if that's more fair or charge it to the other side if that's more fair. We won't charge time for the reading of the final jury instructions, or for the charge conference or for the parties' arguing of JMOLs during the break.

If we have to let the jury recess to decide an objection during trial, that time, including the time moving the jury back and forth, will get assigned as well.

Does anybody have any questions about the jury selection?

MR. WEINGAERTNER: No, Your Honor.

MS. YING: Not here, Your Honor.

04:14:56 THE COURT: Okay. Are the parties agreeable to providing the jurors with lunch every day?

04:15:02 MR. WEINGAERTNER: Yes, Your Honor.

04:15:03 MS. YING: Yes, Your Honor. I think normally we just split it and that's --

04:15:06 THE COURT: That's fine. So work with Mr. Koehler on that.

04:15:08 I think we had the last jury complain that it was the same thing every day, but that trial was significantly longer. So we'll get it figured out.

04:15:22 MR. ROSENTHAL: We'll be better.

04:15:23 THE COURT: Yeah. I think we're good on -- I'm sure we have a very exciting trial. I think we're good on energy drinks, but we'll touch base with you if we need more of those as well.

04:15:34 If you need access to the courtroom to familiarize yourself with the technology, get in touch with Mr. Koehler.

04:15:44 We did receive your proposed voir dire and preliminary instructions. We're looking at those. We'll get you edits as soon as we can. Once we settle on the final voir dire and preliminary jury instructions, we'll ask Plaintiffs to bring 40 copies of the voir dire, along with pens for the prospective jurors the first day of trial, and then also to bring copies of the preliminary jury

04:16:09 instructions. We need enough for the eight jurors. We'll
04:16:13 need three copies here and then copies for counsel on both
04:16:17 sides.

04:16:17 We talked about the charge conference. We'll
04:16:23 try to do that Wednesday night.

04:16:26 MS. YING: Your Honor, if I could ask a question
04:16:28 about the final jury instructions?

04:16:29 THE COURT: Yes.

04:16:29 MS. YING: So in light of the Court's ruling
04:16:31 today and the fact that the parties are working at narrowing
04:16:33 some further issues, it seems like we would probably be able
04:16:36 to narrow some of the more -- some of the disputes in the
04:16:38 final jury instructions. So if there's an opportunity for
04:16:41 us to resubmit so that the universe of issues are narrower,
04:16:45 when would you like that by?

04:16:46 THE COURT: Yeah, absolutely. I can tell you
04:16:49 that I will not be looking at it before -- I'm not going to
04:17:02 be looking at it before June 6th at noon. So June 6th at
04:17:12 noon is fine with me for the final jury instructions --

04:17:14 MS. YING: Thank you, Your Honor.

04:17:15 THE COURT: -- resubmission.

04:17:29 Oh, my Courtroom Deputy wants me to tell
04:17:38 counsel -- remind me to tell you not to touch my screen
04:17:45 during -- everyone does it every time, and I sit up here
04:17:50 seething that my beautiful screen is getting pounded on by

04:17:53 somebody. But I know in the heat of the moment you want to make a point. But it's not a touchscreen, so don't touch the screen.

04:17:59 MR. ROSENTHAL: Your Honor, in that vein, I have a logistical moving-around-the-courtroom type of question.

04:18:03 THE COURT: Yeah.

04:18:04 MR. ROSENTHAL: For opening, I assume that we're at podium place for most of the trial. If that's not true --

04:18:09 THE COURT: No, that's fine. I'm okay with counsel standing to the right, or the left of it or sort of within arm's length is the closest that I want. Within arm's length of the podium is the closest I want you to get to the jury.

04:18:23 MR. ROSENTHAL: And the same is true, that applies to openings as well? In other words --

04:18:26 THE COURT: Yes.

04:18:26 MR. ROSENTHAL: -- stay with the podium?

04:18:27 THE COURT: Yeah.

04:18:27 MR. ROSENTHAL: Thank you.

04:18:28 THE COURT: If you want to walk up to the screen to point to something, I'm totally fine, but I don't want anyone coming this way.

04:18:33 MR. ROSENTHAL: Thank you, Your Honor.

04:18:34 THE COURT: Yeah. We've had a lot of parties

04:18:39 request -- I forget what you call them -- confidence monitors. I don't know if anybody's going to have -- I'm generally not inclined to allow it.

04:18:50 That said, I have not allowed it before and then had Plaintiff's side use their own monitor as a confidence monitor, which Defendants didn't really get the same opportunity.

04:19:01 So are we going to have a request for that in this case?

04:19:03 MR. ROSENTHAL: If I knew what that was --

04:19:05 THE COURT: Yeah.

04:19:06 MR. ROSENTHAL: -- it would be our position.

04:19:07 MR. WEINGAERTNER: Same here.

04:19:08 THE COURT: So, I guess, so they've got a big screen that they have that they sort of tape to the front of the jury box so they can see their notes and do a little -- you know, do their spiel without looking at their notes.

04:19:24 MS. YING: I will say this, Your Honor, in light of the fact that we don't need to seal the courtroom for the source code part, I don't think that that's going to be something that the parties are going to need here. I think that that's the only context in which we've had like little monitors come up before the jurors is when we can't display things to the people who are in the gallery --

04:19:41 THE COURT: Right.

MS. YING: -- but we need to be able to show it to the jury without sealing the courtroom. We've done that before. But I think in light of the fact that we don't need to seal it for the source code, we probably --

THE COURT: But you don't want it. You don't need it. I'm sad I brought it up now because it doesn't sound like you were going to ask for it.

MR. ROSENTHAL: I'll leave it there.

THE COURT: Right. Yeah.

All right. We're not going to have it.

All right. This wasn't a Scheduling Order that was entered by me, so I don't know if it contemplates post-trial stuff. But I'll ask you now, if it doesn't contemplate that, within seven days after the verdict, we should have the parties meet and confer and jointly submit a form of order for judgment on the jury's verdict.

I sometimes try to draft them myself. It's better, I think, if the parties just meet and confer and give me a proposed one. And as long as we get it done within seven days, I think that's fine on the timing.

The parties should also submit a joint status report with their positions on how the case should proceed and listing any post-trial motions they anticipate filing and the proposed briefing limits for those.

All right. Before we get into the MILs, I don't

want to forget to ask you how we're doing on settlement discussions.

MR. WEINGAERTNER: May I begin, Your Honor?

We had the mediation that I thought went well. I can refer to that. It was Court ordered. It happened a few weeks ago. The parties agreed that following the disposition on summary judgment, we would follow up within two weeks.

And so I communicated with Mr. Rosenthal earlier today about that. We haven't gotten anything on the calendar yet, but I think it was quite productive.

THE COURT: Okay.

MR. ROSENTHAL: I have nothing to add other than we will, in fact, within the next two weeks sit down again with the mediator. And if there's anything to report by way of progress, we'll let you -- we'll let the Court know.

I don't want to give the misimpression that we were close. It was productive to have a conversation. We're not close. Maybe we'll get closer now.

THE COURT: Okay. So here's the only thing I'll say about that that we're juggling a lot to get to trial in the next few months. And so as soon as the parties think that the trial will not be necessary, if you could let us know as soon as possible, including by calling my cell phone -- I'm sure local counsel has it written down

04:22:20 somewhere -- just to let me know. I'm happy to take the call on my drive home on the weekend in the evening, because chances are we're going to be doing something, either related to this case or another case. So just as soon as possible knowing if this trial comes off the calendar, I'd appreciate it.

04:22:36 MR. ROSENTHAL: We will.

04:22:37 MR. WEINGAERTNER: We will.

04:22:38 THE COURT: All right. Great.

04:22:40 All right. Let's talk about the MILs.

04:22:47 You know what, let's just go ahead and take a ten-minute recess so we can organize our thoughts, and we'll come back out.

04:22:54 DEPUTY CLERK: All rise.

04:23:24 (Recess was taken.)

04:38:21 DEPUTY CLERK: All rise.

04:38:27 THE COURT: Please be seated.

04:38:28 All right. I have two large volumes of motions in limine papers. I would say for the record maybe four inches of paper.

04:38:48 So let's start with Plaintiff's Motion in Limine Number 1, which is to preclude inequitable conduct arguments in evidence. So let me just tell you what I'm thinking and then we'll hear argument, to the extent we need to, just so that we can try to streamline this process.

04:39:12 So we've already discussed that we're going to have inequitable conduct evidence presented at a bench trial after the jury trial is concluded on Monday and Tuesday. So the question here is whether some of these exhibits -- and I think we counted 36 of them that were attached to Plaintiff's motion -- have relevance apart from the relevance to inequitable conduct. And Defendants have made the point that some of this stuff is relevant to questions of infringement, damages and invalidity.

04:39:58 So I wasn't thinking that it would be appropriate for us to go through all 36 exhibits today and blanket say that they're admissible, because I don't know which ones are going to be used. That said, if Plaintiff wants to make arguments as to why, in general, they don't think any of these documents have any relevance to infringement, damages or invalidity, I'm happy to hear it.

04:40:33 MR. WISNIEFF: Yes, Your Honor. Matthew Wisnieff for the Plaintiff.

04:40:34 May I approach?

04:40:35 THE COURT: Yes.

04:40:39 MR. WISNIEFF: Thank you very much.

04:40:41 So our basic issue is that while the Defendants have alleged that these documents are relevant to things like infringement, invalidity and damages, their invalidity expert -- invalidity and infringement experts don't talk

about any of the 26 documents that were identified. And their damages expert only refers to four of them in her expert report, Ms. Kindler, only in reference to the issue of whether or not CosmoKey commercialized the product. For which not only is there better and more informative evidence in the form of other documents and testimony, so that evidence, the inequitable conduct evidence would be entirely cumulative, but it's also not even an issue that's in dispute.

So from our perspective, the arguments that these are relevant to other issues are entirely pretextual in a bid to get this prejudicial evidence in front of the jury where there really is limited, if any, probative value.

THE COURT: All right. Well, let's just move into the more specific.

So some subset of these exhibits, maybe even the majority, have the named inventor on them either authoring it or receiving it; right?

MR. WISNIEFF: That's correct, Your Honor.

THE COURT: And is he intending to take the stand?

MR. WISNIEFF: He is, Your Honor.

THE COURT: And is he intending to tell his invention story to the jury?

MR. WISNIEFF: He is, Your Honor. That is

correct.

THE COURT: Okay. So is there a reason why he can't be cross-examined with statements that he's made about what the invention is and how it differs from Defendants' product?

MR. WISNIEFF: Well, to that extent, I mean, the documents that are referenced here date to 2012 and 2014 which is two to four years before the patent even issued. So from our perspective, statements at that time about a patent that doesn't even exist in reference to products, which also may not even exist by the time the patent has issued, again, have very limited probative value that is not -- that does not outweigh the prejudicial nature of these materials.

THE COURT: And it's prejudicial in what sense, if it's a statement of the inventor about his own invention?

MR. WISNIEFF: It may, for example, mislead the jury that the inventor withheld, even though that's not the case, evidence before the Patent Office in obtaining his patent.

THE COURT: It might do that, but it might also -- I think I just flipped through them. I didn't -- there's many, many inches of them, but I saw him saying about what he's doing versus what the Defendants are doing with the technology. Shouldn't that be admissible?

Well, how is that prejudicial?

MR. WISNIEFF: Well, we think it's prejudicial under Rule 403, but also under Rule 701, 702 that's tantamount to testimony by a lay expert in that they're effectively saying that the inventor of the '903 patent himself made an evaluation of Defendants' alleged product at that time. And essentially, as an expert, is opining effectively on infringement, invalidity, and we don't think that's appropriate.

He's not going to testify as an expert. He's going to testify as a fact witness.

THE COURT: Well, so that's really a good question, and so that brings me back to the thing I asked you first, which is: What is his testimony -- how is his invention story relevant to anything?

And where I'm going with this is if I'm going to let you put him on the stand and testify about stuff that's arguably not relevant to the issues of infringement or validity, shouldn't they be able to cross him with some stuff about what he thought about his own invention?

You understand what I'm asking?

MR. WISNIEFF: I appreciate that, Your Honor, but I think we have to explain to the jury at least some context of how the parties got here and why there's a dispute. And it may be that a limiting instruction is

appropriate to keep that testimony about the story within proper bounds and not delve into territory where -- you know, where that concern may be present.

THE COURT: Okay. All right.

Let me hear from Defendants if they want to add anything for the record.

MR. ROSENTHAL: Thank you, Your Honor. Just very briefly, because I think there's not much to add.

What we're talking about principally is the inventor, Mr. Adenuga, during the prosecution of this patent uncovered the fact that Duo and Duo Push existed. And he considered it. Not just him, he considered it with his lawyer. They've waived privilege over all of that.

We've taken testimony from him and his lawyer. And he and his lawyer concluded that what we are doing is different than what they were trying to claim.

It's hard to imagine something more probative other than, of course, an expert actually analyzing this stuff. But we ought to be able to cross-examine the inventor who is now here in front of the case. He's the head of the company, and the founder of the company and the inventor saying that we infringe when, back in 2012, he concluded that we are doing something completely different. In his words, we don't -- we don't conflict. We don't conflict -- they don't conflict with our patent. That is

what his words were.

And I understand that the claims change and they can certainly bring that up if they'd like to on redirect or they can head it off if they'd like to, but to exclude that is inappropriate, in our view.

In addition, the concern that was stated in their brief, which is that we are going to imply that they should have disclosed something to the Patent Office, we are absolutely not going to do. We're not going to make -- and we will do that in the evening.

We are not going to do that during the day. We're not going to talk at all about whether it should have been disclosed. Of course, we ought to be able to say that the Patent Office did not, in fact, consider Duo Push. That's, of course, relevant to the question of why the patent was allowed, even though we're arguing invalidity. But we're not going to make any suggestion that there was any wrongdoing. We're simply going to ask the questions about this evidence where he said, I considered this product, and I thought it was different than what we had invented.

THE COURT: Yeah. Thank you very much.

MR. ROSENTHAL: Thank you.

THE COURT: Anything to add?

MR. WISNIEFF: If I may, Your Honor.

With great respect to opposing counsel, I think he did a great job of illustrating exactly the problem here and why these materials are misleading, because all of those conclusions flowed from the premise that what Mr. Adenuga saw actually was the prior system.

And that's the not the case. Mr. Adenuga has never been in possession or reviewed the source code or the system in any capacity. What these documents concern are publicly-available websites that have what amount to high level sort of marketing materials that in no way could disclose what would be necessary to disclose a prior product.

THE COURT: Yeah. I appreciate your point.

I think I know what Defendants' response to all that is, which is that you didn't need the source code to say that you wouldn't infringe. And I think that goes to their challenge to your infringement theory in the first place.

So I understand everything that's going on here. What I'm not going to do is to say that all of this stuff is excluded. I will give you the general guidance that if the inventor's going to sit on the stand and talk to the jury about what he invented, that he can be crossed with any of his prior statements about the invention or the Defendants' products.

I don't think it's cumulative. I don't think it is a problem of offering a lay witness to prove noninfringement.

This is an issue of the inventor of the patent-in-suit had a view about how his invention works and how it's different. That's certainly relevant. I don't think it's unduly prejudicial.

To the extent -- but I'm also not saying that all 36 of these documents are admissible. So if you have objections as to particular documents that you think weren't covered by my ruling today or that you want me to reconsider, you're free to bring them up with the exhibit disputes and we'll hear them in the morning the day they get introduced.

All right. So, in general, that MIL is denied subject to objections to particular exhibits.

MIL Number 2 has to do with --

MR. ROSENTHAL: Your Honor.

THE COURT: Well, I don't know what MIL Number 2 has to do with.

Go ahead.

MR. ROSENTHAL: I was just going to say I have different numbering written down. It could be that I have it wrong, but I thought what we just discussed was MIL Number 2.

04:48:51 THE COURT: Okay. So that was the MIL that is "to preclude inequitable conduct arguments in evidence."

04:48:56 MR. ROSENTHAL: Correct.

04:48:56 THE COURT: Now, I have one called -- it's the way that they appear in my binder, so that may be different from what you have. I have "to preclude documents selectively preserved and produced by Defendants."

04:49:09 I don't know what of this has been resolved by Judge Burke or by me already. What evidence is this motion seeking to exclude from the trial?

04:49:21 MR. WISNIEFF: Thank you, Your Honor. So throughout this case, there has been an issue, a recurring issue where the Defendants have not made complete productions of documents in varying capacities. Some of those have been heard by Judge Burke, but not this particular issue.

04:49:40 And this particular issue concerns the failure of the Defendants to preserve their internal instant messaging systems for a period of approximately ten years from 2013 until August in 2023 with that system primarily being Slack. And testimony from the Defendants' 30(b)(6) witnesses showed that Slack was absolutely instrumental to how they conducted their day-to-day business. It was the starting point "for addressing problems related to the accused products." It was "a stored institutional knowledge

regarding to the accused products."

And that timeline that's missing covers not just when Mr. Adenuga, the inventor of the '903, reached out to Duo's co-founders to inform him of his patent in 2016. It covers the filing of the lawsuit in 2018 and a five-year period thereafter.

So to us it seems inconceivable that there would be no relevant documents among those instant messages that were not preserved. And so what we're seeking to exclude is any argument by the Defendants that when Mr. Adenuga contacted Duo, they were not aware of the '903 patent. Or in the alternative, a jury instruction to the effect of what I just said, that there were ten years of missing instant messages in which that might have been discussed.

THE COURT: Okay. So there's a couple different things going on here.

So at the outset you mentioned that Judge Burke heard a lot of motions about discovery, but not this one. And so I think that begs the question: Why not this one? And is this really appropriate for a motion in limine?

Isn't this a discovery motion? Did you ever make the argument to him that this was -- this qualified as spoliation?

MR. WISNIEFF: So I should clarify. We moved to compel the Slack messages when they were not produced, and

04:51:25 the Defendants responded by saying that they did not exist in a format that could be produced; and therefore, they would not produce them. And Judge Burke heard that dispute.

04:51:33 We did not move Judge Burke for an Order on spoliation related to this same issue previously.

04:51:39 THE COURT: Okay. All right.

04:51:41 And so to the extent you're asking for a request for an instruction as a result of spoliation, that request is going to be denied.

04:51:49 And so what's left now is your motion in limine for me to tell them they can't testify they didn't know about the patent?

04:51:59 MR. WISNIEFF: To preclude the Defendants from disclaiming knowledge as of the date that Mr. Adenuga contacted Duo's co-founders.

04:52:05 THE COURT: Okay. All right. Thanks very much.

04:52:07 Let me hear from the other side on that.

04:52:09 MR. CHUNG: Good afternoon, Your Honor. Your Honor asked a very simple question at the outset: Did Judge Burke already decide this issue? Yes, he did.

04:52:20 Plaintiff brought a motion to compel these Slack messages and he denied that motion. He said we didn't need to produce that motion.

04:52:27 So what this motion in limine is about and the arguments that they're making about the preservation of

04:52:34 Slack messages is a moot point because we are arguing about the preservation of messages that had been held to not -- there isn't a requirement that they were produced or needed to be produced.

04:52:45 And the request for relief here, Your Honor, is really quite extraordinary. They're asking the Court -- they're asking the Court to handcuff our witnesses from testifying truthfully that they didn't have knowledge of the '903 patent.

04:53:03 But there's no evidence in the record at all. They didn't come to the Court with any evidence in the record. They've gotten thousands of documents, hundreds of thousands of pages of documents. They've deposed 12 current or former Duo Security employees, and they haven't shown the Court anything that could suggest that there are Slack messages on which anybody at Duo Security discussed the '903 patent.

04:53:29 In fact, they -- of the 12 witnesses that they deposed in this case, they only asked four of them about Slack. And for those four witnesses, they didn't even ask the very simple question: Did you discuss the '903 patent on Slack? Or did you or are you aware of anyone who discussed the '903 patent on Slack?

04:53:48 And so we're here, again, on an argument that Plaintiff has been making since last year after Judge Burke

already denied the motion to compel. He has held that we did not need to produce these documents.

And so this request for relief on willful infringement is truly extraordinary, Your Honor, and we ask that it be denied.

THE COURT: Thank you.

Counsel.

MR. WISNIEFF: Thank you, Your Honor. Just a few remarks.

As I referred to in my opening statement, while it is true that Judge Burke denied our request to compel the documents, he did so on the basis of Defendants' representations that there was nothing to produce, that the documents did not exist.

And in our view, the Defendants did have an obligation to preserve those materials, at least from the date of the filing of the Complaint in 2018 to at least the date in March of 2023 when the ESI protocol was entered. And during that five-year time span, they were under an obligation under common law to preserve all potentially relevant materials, and they failed to do so.

In response to the argument that there is no evidence in the record suggesting that the Slack messages would have contained relevant information, again, I refer to my opening statement in which we asked Defendants' 30(b)(6)

witness, Ben Murray, about this issue, and he testified at length about the importance of Slack messages to the day-to-day business. He called them essential, especially after COVID, for resolving issues or regarding the accused products. Again, he called them a starting point for addressing problems related to those products.

THE COURT: Well, after -- wait a second. COVID happened in 2020, and the lawsuit had already been pending for two years at that point; correct?

MR. WISNIEFF: That's correct, Your Honor.

THE COURT: So we're not producing -- I mean, you guys weren't producing discussions about the patent once the litigation had already started; right, because that's not what we do usually in Delaware?

MR. WISNIEFF: Yeah, but that 2020 date would have fallen within that five-year time frame from the date of the filing of the Complaint until August of 2023 when the Defendants put in a sworn declarant who said that they did not begin preserving Slack messages until August of 2023. So there is a large span of time for which these documents are completely unavailable due to Defendants' failure to preserve them.

THE COURT: All right. Thank you very much.

MR. WISNIEFF: Thank you, Your Honor.

THE COURT: So on this motion, again, as I

already stated, the idea here wasn't to permit a discovery spoliation motion long after discovery had closed. I don't think this is an appropriate motion in limine.

To the extent that the motion is restricted to telling them they can't put on evidence that they had no knowledge of the patent, it's denied. Whether or not Defendants have knowledge of the patent is relevant to the case.

It's denied for other reasons as well, including that there's no basis before me to find that these would have been in Slack messages prior to the case being filed. In addition, Judge Burke found that there was no requirement to produce the Slack messages any way. So that MIL is denied.

Let's move on to MIL Number 3 on my list, which is to preclude arguments and evidence that is refuted by binding 30(b)(6) testimony.

Go ahead.

MR. WISNIEFF: Thank you, Your Honor. I'll try to be brief. The basic ambit of this MIL is that the Defendants were -- I'll take a step back. The Defendants intend to put on a prior use or invention defense, as we've heard throughout the course of the day today.

As part of that defense, they have to establish certain facts regarding their -- again, their prior use or

their publication of that invention. And for each element of that prior use and invention defense, Defendant's Rule 30(b)(6) witness, Mr. Oberheide, one of Duo's co-founders, was asked about each of those elements. And for each of those elements, he disclaimed any knowledge.

So from our perspective, this is not a situation where a witness was deposed, then threatens to refute their testimony on the stand for which they could be cross-examined.

THE COURT: But he didn't disclaim knowledge that there was a Duo product or something that -- maybe it was called something different, that there was a product that he was using in 2010. He didn't disclaim knowledge of that; right?

MR. WISNIEFF: He disclaimed any knowledge of when he used a possible product, what that possible product entailed. He provided no details about that product whatsoever. And he repeatedly stated that he was not aware of when a product might have been used or what that product might have consisted of.

THE COURT: Okay. But you were given discovery from the Defendants that had source code that was dated as of the certain time, and your experts got a chance to look at that; right?

MR. WISNIEFF: That's correct. Subject, of

course, to the disputes we talked about today.

THE COURT: Right. Yeah.

MR. WISNIEFF: If I might quote from Mr. Oberheide's testimony, though, if that would be helpful. And, again, this is in our briefing, so it's up to you whether --

THE COURT: Yeah.

MR. WISNIEFF: -- you want to hear it again.

THE COURT: Yeah.

MR. WISNIEFF: But, for example, he had no knowledge of what code might have been implemented. He was asked --

(Reporter clarification.)

THE COURT: Sure. I'm sorry.

He had no knowledge of what code might have been implemented. He was asked, "And what about that earlier part off data 2010-10-25?"

He answered, "No idea."

And the attorney asked again: "Okay. Are you able to tell me what build-in version of the code this corresponds to?"

He responded, "No."

He also testified --

THE COURT: Was he designated for that topic?

MR. WISNIEFF: Yes, he was.

04:59:14 THE COURT: Okay.

04:59:15 MR. WISNIEFF: He also testified that he had no knowledge of what software versions were in effect at that time.

04:59:19 The questioning attorney asked: "Do you know what versions of source code might refer to those products?"

04:59:24 He responded, "I do not."

04:59:25 He had no knowledge of whether code or software was used during the relevant time period. He was asked: "Do you know when this might have been used, if at all?"

04:59:34 He responded, "Not with any confidence. There is a date in the file name, but I certainly would not rely on that for any assessment."

04:59:40 And then he had no knowledge of when any product might have been presented to third parties of the public when asked on 11 different occasions.

04:59:47 THE COURT: All right. Thank you very much.

04:59:49 MR. WISNIEFF: Thank you, Your Honor.

04:59:50 THE COURT: Let me hear from the other side.

04:59:52 MR. SCHARN: Thank you, Your Honor.

04:59:56 As you might imagine, we disagree with the characterizations about what Mr. Oberheide knew about the system that was in operation in 2010. And I think that you need look no further than Exhibit 132 to Mr. Wisnieff's declaration, which was submitted in support of this motion.

05:00:13 In that exhibit, we have Mr. Oberheide's testimony. And you see that he's talking at Pages 79, 90, 104 about the push feature that was in 2010 demonstrations, that he presented the push feature at a SINET presentation in about May of 2010. And he knew, you know, deep details about that.

05:00:37 On the slide presentation, there is a picture of the push with the Citi -- Citibank emblem on it. And he said, "Oh, the actual push that I presented did not have Citibank. It was logging into a Juniper VPN." He knew painstaking detail about the use of the push feature in 2010.

05:00:55 Now, what Mr. Wisnieff was just speaking about was part of a file path that is an artifact of discovery. So when we produce things, we have Bates numbers. When we produce source code, we have to organize it into files on a computer. And part of the file path name is the actual file path that says -- you know, corresponds to how it would be organized for implementation on a server and in an actual code environment. And part of it is just to put it in a folder so that it can be reviewed by the source code experts and the attorneys.

05:01:28 And the part that Mr. Oberheide was not familiar with was the part that corresponded to production, the -- you know, the folder that it was placed in for review. Now,

Mr. Oberheide was not the designee on collection and production of source code. That was Mr. Murray. And they had the opportunity to ask Mr. Murray about collection and production.

The reason is very simple. When we did it, Mr. Oberheide was no longer with the company, so Mr. Murray was the one to actually collect the code.

Now, there was some questioning on about 12 pages of code. Keep in mind that he was designated on about ten different builds of code from 2010 to 2018, which had hundreds of thousands of lines in it. And he did ask for more context to be able to understand what is calling what in that code.

So there was some ambiguity there, but CosmoKey's counsel declined to provide him that context when he asked for it. We asked them in advance, "If there are particular pieces of code that you would like him to be specifically educated on, please identify it for us so that we can make sure that he is up to speed specifically on that code." They declined to do so.

We would have happily accommodated that request. And the problem is that these isolated pieces of code really have, you know, very little obvious relationship to what was going on in the case. So there's no way that he could have picked these particular things and memorized exactly how it

relates to the entire code environment. And that's apparently what they expected him to do.

Now, the other problem is on the law. There is simply no law that says that if somebody has, you know, arguably inconsistent 30(b)(6) testimony, then an entire defense is precluded from trial. That's what they're asking for. This is their third attempt to try to get our defense based on Duo Push, as used in 2010, which had different names at the time, Scio Agent, Scio Push, et cetera.

This is their third attempt to try to get it excluded from the case. The first was a motion to strike, which was denied on Friday.

The second was a Daubert motion against our expert, Dr. Jeffay, which Your Honor denied on Monday.

This is not a case of inadequate disclosure. There are multiple expert reports. It's in invalidity contentions. There are many, many builds of source code produced. There are presentations. There is robust disclosure.

And the Court, this Court and Judge Burke, have found that there is robust disclosures of our 2010 theory. So the basis for throwing out the entire theory on this idea that there is some lack of knowledge about something that happened in 2010, there is no authority that supports that.

I'm happy to discuss the cases in more detail if

05:04:16 Your Honor would like, but I will say -- sorry. I lost my train of thought on that one.

05:04:28 Oh, sorry. Yes. The *Rainey* case is all about just excluding affidavits that are contradictory to summary judgment motions. So that -- even that holding has been called into question.

05:04:42 THE COURT: All right. Thank you very much.

05:04:48 So, I mean, is your point that this -- well, you want to stop -- I just want to make sure I understand what you're asking for.

05:05:05 You want to stop Defendants from being able to say that a certain product that they were using in 2010 had certain features because, notwithstanding that they gave you evidence from a person that pulled the code from that time, notwithstanding that, that a 30(b)(6) witness designated for the point of what features the product had in that time frame couldn't identify certain file paths that had to do with the way that the documents were produced?

05:05:51 Is that -- am I missing something?

05:05:53 MR. WISNIEFF: With respect, Your Honor, I think so.

05:05:56 THE COURT: Okay.

05:05:56 MR. WISNIEFF: The issue is not one merely of source code. As I talked about in the quotations from Mr. Oberheide's testimony, the issue is one of when features

were available, when features were presented to the public, when features were used.

And those facts are not restricted to the source code file that counsel spoke of. They were broader than that, and they were squarely within the ambit of the two Rule 30(b)(6) topics that are at issue here, which if I may read them.

Topic Number 45 reads, "The products, services, additions and features offered by Duo and the constituent software source code, hardware, methods and processes that Duo contends are prior art, including the Duo Push and OATHTOPT standard cited in Defendants' supplemental invalidity contentions."

And Topic Number 46, which is "Defendants' conception, design, development, reduction to practice, use, disclosure, descriptions, demonstrations and sale of prior art prior to October 31st, 2011."

So it's not purely an issue of which, you know, they concede that the date on the source code file is artifact to the litigation. It's not an issue of Mr. Oberheide merely not recognizing it.

It's an issue of Mr. Oberheide testifying in his capacity as a Rule 30(b)(6) witness, not knowing on behalf of Defendants when features were being used, when their prior use and invention defense requires that they take a

05:07:19 position on that.

05:07:20 So they're going to come to trial with a position that they didn't know at the Rule 30(b)(6) deposition and didn't testify to it.

05:07:27 THE COURT: Understood. And just to make clear for the record, it's not a position that surprises you in any way because you had ample discovery about what their position is in the form of contentions and expert reports; right?

05:07:46 MR. WISNIEFF: That's correct, Your Honor. It's more a question of the legal sufficiency of their position.

05:07:49 THE COURT: Okay. All right.

05:07:50 Thanks very much.

05:07:51 MR. WISNIEFF: You're welcome, Your Honor.

05:07:52 THE COURT: So this motion will also be denied for the reasons that I just stated. This is not a surprise issue for you. You had plenty of discovery on what their position is as to this being prior art. And I don't think they're bound in the sense that they lose an entire invalidity defense because of the sufficiency of their 30(b)(6) witness.

05:08:21 That said, the rules allow you to use testimony of a 30(b)(6) witness at trial in the way that the rules allow it to be used. And you're free to do that.

05:08:32 But in terms of your argument that that

precludes them from using this as a defense, I disagree. And so the motion is denied.

All right. Let's move to Defendants' motions. The first one that I have on my list has to do with the IPR. So why don't I give you my thoughts generally on this and then maybe we can either move into some specifics about what the dispute is or delay some of it to another time.

I generally don't allow evidence about the outcome of IPR proceedings. So, generally, I wouldn't allow a party to introduce evidence of the PTAB's decision to deny institution. But if there was a statement made by one side or the other during the IPR that has some separate relevance, I'd be willing to hear what that is and decide if it's admissible.

I don't know if people have particular concerns they want to discuss now. I'm assuming Defendants are wanting to introduce some statements made by the patentee during the IPR about how the claims differed from certain prior art, and I guess that's part of the prosecution history. I don't know if that's properly in front of the jury, but I'll hear whatever anybody wants to say.

MR. CHUNG: Yes, Your Honor. Your Honor's correct that there are some very clear statements in the IPR proceedings from Plaintiff about the meaning of the claim limitations and the scope of the claims. An example is that

05:10:27 confirming or denying does not meet the claim limitations when they were distinguishing the prior art, but that is what they are accusing in this case.

05:10:37 Another example is a statement to distinguish the prior art as not meeting the predetermined time relation limitation. They argued in the IPR proceedings that the time can begin or the time must begin at the time user information is sent. And here, they're arguing that it can be sometime after.

05:11:00 And we can present all these statements without mentioning the IPR proceedings at all. We can just say they previously made the statement or they made the statement in another proceeding. That's entirely consistent with the approach that Courts in this district have taken.

05:11:17 THE COURT: Mm-hmm. Well, let me hear what they have to say first.

05:11:22 Go ahead, Counsel.

05:11:22 MR. WISNIEFF: Thank you, Your Honor. As I think you alluded to in your remarks, the issue is not that we intend to present the ultimate outcome of the IPR decision as evidence.

05:11:34 Our issue is that this cannot be a one-way street where they can quote from CosmoKey's statements in the IPRs, but their statements in the petition about the same prior art or findings by the PTAB regarding that

specific issue of prior art are also inadmissible where they might conflict.

THE COURT: So we're not going to have any findings by the PTAB about what's in the prior art. That's not going to get into evidence, so we don't have to worry about that.

What is it you want to introduce about their statements?

MR. WISNIEFF: So one example that comes to our mind is there's a piece of prior art called Brand that they allege that we distinguished, but we never distinguished that prior art in the way that they're suggesting. Because the way they introduce that in the petition, it never called for that issue to be addressed, whether by the PTAB or the parties.

So it's misleading to present those statements by CosmoKey by themselves without the context of what issues they were raising in the petition and how the PTAB ruled as to that specific piece of prior art.

THE COURT: What about their point about what you said in the PTAB -- to the PTAB in the IPR about the time issue, because I went and looked at that earlier this afternoon.

Is that a -- shouldn't they be able to tell that to the jury or does it have to do with claim construction?

05:12:58 Is that something the Court should make a claim construction on?

05:13:01 MR. WISNIEFF: Possibly. But I think our position is the same that if they are going to present those statements to the jury, we should be permitted to present the context of how those disputes arose before the PTAB so the jury knows what issues are being presented that CosmoKey was actually commenting on, and so that CosmoKey statements are taken out of context.

05:13:20 And there's case law that says where IPR evidence is being introduced in any capacity, it's actually inappropriate. It's confusing and misleading to present those in isolation. There has to be some bedrock context that's being provided to explain what those statements mean.

05:13:33 THE COURT: And you think that can't be done without telling -- like what's your proposal? Maybe they would agree to it.

05:13:40 MR. WISNIEFF: We're happy to confer with them and see if there is a mutually agreeable proposal where the parties can put forward the evidence that they want. But we haven't heard any suggestion by the Defendants besides what they sought in their MIL, which was a blanket preclusion of everything in the IPRs except the statements they wanted to present.

05:13:57 THE COURT: Okay. Well, all right.

Let me hear from the other side.

Are we just going to have to take this on a case-by-case basis? I mean, the one thing I ruled on today is we're not going to hear about the PTAB said this, and so you, the jury, should find this. The PTAB found this wasn't disclosed in Brand. We're not going to hear any of that.

We're also not going to hear anything, and hopefully this was clear by what I said before, that these guys have been trying to invalidate our patent, and they couldn't do it. And, therefore, they're willfully infringing. We're not going to hear that, either.

Beyond that, I'm open to hearing either party's statements that they have made and maybe we can work some of this out.

MR. CHUNG: Yeah. I'm curious as to what the context that they want to include as a response to our reference to those statements, because in the briefing all they referred to was the outcome of the proceedings and the proceedings themselves. And as Your Honor just stated, those are out.

So if there is other context like statements from either party from the proceedings that can be introduced without referencing the proceedings or the outcomes themselves, then we probably would be okay with that. We're not saying it's a one-way street.

THE COURT: Okay. So I'm going to ask the parties to meet and confer, and we'll hear this dispute when it's more crystallized than it is right now.

But I don't think that the IPR's outcome decision is relevant to the case, and any probative value is substantially outweighed by prejudice.

So I'll also put on the record that the IPR here happened well after this case was filed. So to the extent it has any relevance to willfulness ever, it really doesn't here, given that Defendants were well on notice of the existence of the patent by the time we got to the IPR.

And, also, I should note that not all of the prior art was before the IPR. And, in fact, we're not bringing the same grounds because we can't bring the same grounds that were at issue in the IPR. So that's MIL 1 on my list.

MIL 2 of Defendants on my list is "exclude evidence and argument regarding pretrial proceedings." I will say that I can think of no reason why we should be talking about the Federal Circuit's 101 opinion.

Beyond that, we've got an issue about Slack. We have an issue about Duo Push 2010 documents. And then we have an issue about source code versions.

So let's hear those.

MS. NEBUCHINA: Good afternoon, Your Honor.

Yana Nebuchina for Defendants.

Your Honor, our position is simple. It's just that CosmoKey should not be allowed to relitigate pretrial proceedings and issues in front of the jury. The parties participated in a discovery process that was overseen by Magistrate Judge Burke and this Court. During those discovery proceedings, CosmoKey filed motions on the same topics that are at issue in this motion.

Your Honor has already heard two motions in limine today about similar topics that are at issue here and has ruled on those MILs. And our position is that CosmoKey, by trying to suggest to the jury that Defendants have failed to preserve, failed to produce, intentionally withheld relevant documents or source code, amounts to an adverse inference, where none has been ordered by this Court, where there has been no sanctions finding against Defendants, and where there's, honestly, no evidence that Defendants have failed in preservation or have withheld relevant documents.

And Your Honor mentioned Duo Push 2010, and then the source code and Slack, I believe. And I'm happy to discuss those.

THE COURT: That's how the parties had it separated out.

MS. NEBUCHINA: Right, right. So I'm happy to discuss those issues in more detail.

05:18:23 For Duo Push 2010, I think, again, Your Honor has already heard about this issue, both today and in the briefings. But CosmoKey wants to suggest to the jury that there were relevant documents and code from 2010 that Defendants failed to preserve or intentionally withheld. And there's no evidence of that.

05:18:43 Defendants have produced source code. They produced revision logs, emails, IRC chats, Power-Point presentations, other materials from 2010. And there's no evidence that any information was withheld. What was available was produced.

05:18:57 The second category, I think, is Slack. And, again, Your Honor heard about Slack already, and I think has heard about it before, as well as Magistrate Judge Burke. But, again, CosmoKey should not be allowed to suggest to the jury that there are missing Slack messages that might have had relevant information about Mr. Adenuga's patent and in which Defendants were discussing that patent. And I actually think that's it.

05:19:27 And, of course, the result from such a suggestion to the jury for Defendants would be confusion and prejudice, and it would be very difficult for Defendants to come back from that. Because if the jury hears that CosmoKey's suggestion that Defendants hid documents that were relevant to this case, it may think the Defendants were

05:19:48 engaged in abuse of litigation tactics. It may think that there's hidden evidence that they're not hearing, and that would be severely prejudicial to us.

05:19:55 THE COURT: Well, let me ask you about the source code stuff.

05:19:58 MS. NEBUCHINA: Sure.

05:19:58 THE COURT: So my recollection is that there was source code produced from October 2010, and then we have testimony saying, This is also the same functionality that was earlier in the year in May; right?

05:20:14 MS. NEBUCHINA: Mm-hmm.

05:20:14 THE COURT: And so what's wrong with them making the point to the jury that, Hey, by the way, you didn't see any source code from May 2010. And then you saying, Hey, you guys didn't ask for source code from May 2010. And them responding, Yeah, that may be true, but you guys, if it actually had something in it that was good for you, you would have shown it to everybody.

05:20:43 I mean, isn't that all perfectly appropriate?

05:20:46 MS. NEBUCHINA: So maybe the distinction that we would draw or that we would ask is that, you know, our technical expert is Dr. Jeffay. And some of this same 2010 source code stuff was the subject of the motion to strike his reply report. Because in that reply report and, again, I think that this was what Mr. Scharn was talking about,

05:21:06 Dr. Jeffay cited to certain revision emails from April, May, June 2010, I think that he said, Okay. This is when this functionality was introduced based on my review of this email.

05:21:15 So what we would propose is completely, you know, by the book and okay would be for CosmoKey to ask Dr. Jeffay, Well, okay. We see your opinions here, but it's true that you didn't review a full set of source code from May 2010; is that correct? And so he would be able to, you know, respond there.

05:21:33 Our -- you know, what we would seek to exclude is the suggestion that we -- that this source code doesn't exist, that we withheld it, that we, you know, engaged in some sort of, I don't know, less than above-board behavior with our production of the source code. We think that's where the prejudice is really going to come in.

05:21:52 But, of course, we think that they can ask Dr. Jeffay, Well, Dr. Jeffay, you didn't review a full set of source code. All you reviewed from May 2010 is the revision log or the revision email. And we think that's the effective way of dealing with that.

05:22:04 THE COURT: Okay. All right.

05:22:05 Let me hear from Plaintiff's counsel.

05:22:06 So let's just see if we can just break this down. What do you think you might tell the jury about

Slack? Are you going to tell the jury that they destroyed Slack evidence and didn't get to it?

MR. WISNIEFF: Well, they admit that they destroyed Slack evidence and then they -- in a sworn affidavit.

THE COURT: So you're going to bring that up at trial? That's your plan?

MR. WISNIEFF: If they present evidence that says that, you know, there's no indication that, you know -- for example, willfulness, there's no indication that anyone knew about the patent in 2016 when we put forward evidence that Mr. Adenuga contacted the Defendants. We want to be able to say there wasn't a complete production of documents from that time frame when it's likely they would have discussed that at the time.

THE COURT: Okay. So that request from them to preclude you from making that argument, that's going to be granted. So we're not going to be arguing that, and that goes with the ruling that I already made, which recognized that Judge Burke didn't require that stuff to be produced.

So let's move on to the Duo Push 2010 documents. I don't know what exactly they're worried about or what documents we're talking about.

What is it that you would like to do?

MR. WISNIEFF: I actually think you articulated

05:23:19 it very well, Your Honor, earlier when you said that if they come forward and say, Well, here's change logs from May and April of 2010, when they didn't produce a source code version from those time periods, we want to be able to tell the jury, Well, they didn't produce a full set of source code from that time period.

05:23:34 THE COURT: And then they can make the point that you didn't ask for it; right?

05:23:37 MR. WISNIEFF: Correct, Your Honor.

05:23:38 THE COURT: That would be fair. And then you can make the point that, Yeah, we didn't ask for it. But if it says what they say it probably said, they would have shown it to you. Then, okay.

05:23:46 MR. WISNIEFF: Correct, Your Honor.

05:23:46 THE COURT: They just don't want you to say -- and I think they're okay with that, too. They just don't want you to say that it was somehow destroyed or withheld and that they're hiding evidence from you. There's a distinction there, I think.

05:23:57 MR. WISNIEFF: Absolutely, Your Honor. And we appreciate that. And we think that this distinction of what you're describing in terms of how we would treat these materials is consistent with the case law where, you know, the context of trial would provide clarity, for example, on the issues that are being presented.

THE COURT: Okay. So I think we're all in agreement on the remainder of it? Yes?

MS. NEBUCHINA: I think so. Yes, Your Honor.

MR. WISNIEFF: The only piece that I would mention is that both parties' experts do discuss the Federal Circuit decision in some capacity. And if their experts are going to introduce commentary in the Federal Circuit decision, we would like the opportunity to rebut that from --

THE COURT: Yeah. We shouldn't be hearing about the Federal Circuit decision at all.

MS. NEBUCHINA: No. Our expert is not going to discuss the Federal Circuit decisions.

THE COURT: Okay. We're good on that.

All right. Thank you.

So that one's denied in part and granted in part as discussed on the record. And I'll have the parties consult the transcript if they have any questions about that.

And then, finally, we have Defendants' last motion in limine that has to do with putting big numbers up on the screen. So I'll tell you this much: I got an A in Accounting for Lawyers, but it was a multiple-choice test. So some of these terms you might have to explain it to me like I'm a beginner about what they mean.

Go ahead.

MS. NEBUCHINA: I also took Accounting for Lawyers, Your Honor. I think it's maybe not a commonly -- even maybe not a commonly offered class.

THE COURT: Well, they planned it easy on the test. That's why I find myself in this situation now.

MS. NEBUCHINA: Well, you know, Your Honor, I think that we don't even need to get into that. And I think that really the scope of our motion, I think, is pretty simple.

THE COURT: Those two big numbers you're worried about, what are they?

MS. NEBUCHINA: Right. Exactly. Well, so I would say two big numbers, maybe three.

It's -- and I'll start with the easiest maybe, the acquisition price. That's the simplest, I think, to put forth.

Related to that would be Duo's valuations before the acquisition. So as it was doing its funding, its like fundraising rounds, what the values of those were.

And then the other number or set of numbers, I would say, would be the overall revenues and related metrics. And on that point, Your Honor, I just want to make clear that, as Your Honor well knows, we have a Daubert motion for Mr. Lewis who is CosmoKey's damages expert. And

in that motion, we challenge his apportionment methods.

And, you know, that's separate from the scope of our motion here. So we're not seeking to exclude the number that Mr. Lewis starts with as his royalty base. So he starts with a number, whatever, you know, the Court decides is appropriate, whatever the beginning of his calculation is. That's okay.

What we are trying to exclude is numbers beyond that that he uses in his calculation. And, first, we think that the probative value of those numbers is very minimal because, again, the point of the motion is that we're trying to exclude numbers that are not included in either party's expert's calculations. Not part of the math that they're doing, not part of the accounting.

So -- and CosmoKey does cite in its opposition, for example, Mr. Lewis' analysis under *Georgia-Pacific* Factor 8 where he does reference in passing Duo's acquisition $2.35 billion. He also references the overall -- one of the overall revenue numbers.

But, again, we believe that the probative value of those references is minimal, because he's not relying on those numbers even really for his conclusions under *Georgia-Pacific* Factor 8, which are high-level, qualitative. And he's certainly not relying on them for his quantitative calculations.

And the prejudice to Defendants is severe and would be difficult, I think, to cure through cross-examination or a limiting instruction. Because once the jury hears $2.35 billion, it will be very difficult for Defendants to take that number out of their imagination. And they might, based on hearing that number, think, Well, the damages ask in this case is nothing to Cisco. That's, you know, a month to them, a day, a week, whatever. And they may either find for CosmoKey just on the basis of that emotion or they may increase the amount in damages that they believe CosmoKey is entitled to on the basis of those emotions. And that's why we think that they should be excluded, Your Honor.

Thank you.

THE COURT: Okay. And wait a second, though.

MS. NEBUCHINA: Sorry, Your Honor.

THE COURT: You slipped something through in the beginning that I didn't understand to be part of your motion, which has to do with Duo's valuation before the acquisition.

Are we talking about a big number or is there some sub-number in there that has to do with you valuing exactly what the multi-factor authentication is for?

MS. NEBUCHINA: Oh, I think it's related to the acquisition price in a way in the sense that -- I mean, and

I don't have the number of rounds at my fingertips that Duo had. But if we call it three rounds or A, B C, you know, they raised 70 million. And, again, these numbers are not at my fingertips right now. 70 million, a hundred million, 300 million. We think that they're related to the acquisition price in the sense of, you know, it's just kind of a trajectory, right. So what starts at the C round, for example, and ends with an acquisition at $2.3 billion. And similar arguments would apply to those valuations as well.

THE COURT: And were those relied on by their experts?

MS. NEBUCHINA: Well, not in a quantitative -- not in the calculations. So, again, I think the scope of our motion is we'd like to exclude big numbers that would be highly prejudicial to us that are not part of the calculations.

And, again, Georgia -- like CosmoKey cites to Mr. Lewis' *Georgia-Pacific* analysis 8. And I can quote if it would be helpful for Your Honor or we could, you know, put it up, how he references, for example, the acquisition price, how he references overall revenues. And then the conclusions that he comes to for that factor, which, for example, include -- as to overall revenues, the conclusion he comes to is Duo had launched two accused products that achieved stable revenues and was developing a third.

Our position is that compared to the prejudice from introducing that number, that number is not -- overall revenues is not -- he does not need to directly rely on that number to support that conclusion. He can support that conclusion any number of ways without presenting that number to the jury. And the similar argument applies to the others.

THE COURT: Thank you.

MS. NEBUCHINA: Thank you.

MR. WISNIEFF: Hello again, Your Honor. So our position is that -- and I do want to just note for the record that this is the first time we're hearing about the valuation issue and the fundraising. So if there are disputes about that issue, we may want to revisit this or meet and confer.

THE COURT: I think that's fair. Let's hear those, to the extent that we're going to hear about them, in disputes in the morning. So see if you can get those worked out about what you plan to do with the other side before the expert testifies on it.

So let's put that aside for now, and let's talk about overall revenue and $2.3 billion acquisition.

MR. WISNIEFF: So I'll talk about what I think is the more complicated one first, which is the acquisition price. And the issue there is that even if the experts

don't use that, the acquisition price, as part of their quantitative assessments for apportionment or valuation, they are separately relevant to qualitative assessments under *Georgia-Pacific*.

And the two *Georgia-Pacific* factors that are at issue are Factor 8 and primarily Factor 13. And if I can read Factor 13 to you today, it states, "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks or significant features or improvements added by the infringer."

And the issue is that when Duo was being sold to Cisco, numerous parties, including third-party consultants, but also the parties themselves, made quantitative assessments about the valuation of Duo's IP, and goodwill, and technology and business as part of that acquisition price. And it is not possible to understand the relevance of those issues, which would cut both ways. Some we would say should be credited to the invention. Others they would say should be credited to Duo.

There's no way to understand that without understanding what transactions they're a part of. Both parties' damages experts cite to the $2.3 million number. Both of them discuss the background and the context regarding the acquisition, which I should note occurred

within two months of the Complaint in this case being filed, which I suppose is an interesting coincidence, but illustrates that these issues are front of mind for both of the parties. And I think both of the parties considered them to be relevant. So this amounts to an exclusion, in our view, or an attempt to exclude relevant evidence from the expert analyses.

THE COURT: I just want to make sure I understand. Your expert mentions the $2.35 billion, and you're saying your expert also took a step further to say that, Of that $2.35 billion, this amount is attributable to the claimed invention versus other stuff?

MR. WISNIEFF: No. I think what I'm saying is that our expert took the fact of the acquisition and, noting the acquisition price, applied that as part of a qualitative analysis under *Georgia-Pacific*, particularly with respect to Factors 8 and 13.

THE COURT: Okay. But what does it mean to -- you know, what is the -- why do you need the number then; right? What relevance does the number have except to tell the jury that this is a really big number? Because there's nothing to compare it to; right?

If you're going to -- I mean, qualitative is like you're comparing something to something else. It's just not a number floating in space.

05:33:34 MR. WISNIEFF: Well, I'm not sure if that's true. Not every factor under *Georgia-Pacific* is equal. And when experts weigh the *Georgia-Pacific* factors, they have to assign different weight to different factors. And that $2.35 billion number is a very informative data point illustrating how much weight should be given to some *Georgia-Pacific* factors over others. They're not going to be the same in every single case, and they depend on the facts in every single case.

05:33:56 So without that number, it's actually not possible, I think, to do a proper analysis under *Georgia-Pacific*.

05:34:01 THE COURT: All right. Thank you very much.

05:34:03 Counsel.

05:34:05 Oh, did you have anything else you wanted to say about the overall revenue?

05:34:11 MR. WISNIEFF: Oh, thank you. I appreciate the reminder, Your Honor. Thank you very much.

05:34:13 On top line revenues, I just want to point out that the financial data produced by the Defendants included top line revenues as a starting point. Mr. Lewis analyzes them as part of breaking them down and trying to apportion to the additive value of the '903 patent.

05:34:27 But he does not state that the overall revenues reflect in any way what should be the damages amount.

05:34:33 They're just a necessary starting point for him to start doing the math. He's got to start somewhere. He's got to start cutting from somewhere, and that was the manner in which the data was produced.

05:34:41 THE COURT: Right. Okay.

05:34:43 All right. All right. Let me hear from Defendants.

05:34:45 So you're not going to make the argument that their expert shouldn't be credited because he didn't properly calculate the royalty base from the overall top line revenues; right?

05:35:05 MS. NEBUCHINA: Right. Whatever Your Honor decides on the Daubert motion and whatever Your Honor decides is the correct way to apportion the apportionment, that is what we're going to go with and we're not going to try to undermine that.

05:35:16 THE COURT: Okay.

05:35:17 MS. NEBUCHINA: And, Your Honor, I welcome any questions that the Court has and I don't want to drag this out. And Defendants agreed to discuss pre-acquisition funding as necessary.

05:35:27 I just wanted to point out for Plaintiff and for Your Honor, we do mention pre-acquisition funding in Page 2 of our opening brief. We're limited to three pages, so we're not able to discuss everything in detail, but we

included that as part of the Defendants' valuations and acquisition price as sort of one category.

THE COURT: Okay.

MS. NEBUCHINA: So I just wanted to flag that. And I'm happy to answer any questions Your Honor has.

THE COURT: Thank you.

MS. NEBUCHINA: And I would just point out, I think, that I don't believe Mr. Lewis goes into a weighting of the -- weighing of the *Georgia-Pacific* factors. I believe that counsel was discussing how different *Georgia-Pacific* factors may be assigned a specific weight or a different weight and how the $2.35 billion number, you know, makes *Georgia-Pacific* Factor 8 in this case so much weightier.

But I think that actually one of the issues that we discussed in our Daubert motion for Mr. Lewis was that his *Georgia-Pacific* analysis is a black box, and he does not describe how he weights one more than the other or how that -- the $2.35 billion number plays into that --

THE COURT: Okay.

MS. NEBUCHINA: -- in his reports. Thank you, Your Honor.

THE COURT: All right. Thank you very much.

All right. So Counsel will discuss the valuation stuff. I don't have it in front of me, so I can't

really say anything about it.

With regard to the request to keep out of the jury the $2.35 billion acquisition, I think this is a discretionary call and the request is to exclude it under Rule 403. I do think that the prejudicial value greatly outweighs the probative value, so that's going to get excluded.

The experts are free to talk about the fact that the acquisition happened. This number was not used in any calculations, and so that's what I'll say about that.

With respect to the overall revenues, given defense counsel's representation that there's not going to be any argument that the beginning of the calculation of the royalty base was somehow inappropriately done based on what the overall revenues were, we're going to exclude the overall revenues as well under Rule 403 for the same reasons already stated.

Okay. That was everything I had on my list.

This is a lot more in terms of the number of disputes than we usually have, but I will say this, which is that counsel did a great job keeping their arguments efficient, to the point. And I appreciate how quickly we were able to get through this, so I thank you for that.

Is there anything else we should address while we're all here?

MR. ROSENTHAL: No, Your Honor. Just thank you so much for getting all of the other motions out as well and for the time today.

THE COURT: And we'll work on the remaining one.

Counsel.

MR. WEINGAERTNER: Nothing further. Thank you, Your Honor.

THE COURT: All right. And I'll just direct the parties to consult the transcript of today's proceedings. And if there are any disputes or requests for clarification, we can deal with those closer to trial. I guess we'll see you in a couple weeks.

Thanks.

COURTROOM DEPUTY: All rise.

ALL COUNSEL: Thank you, Your Honor.

(Court was adjourned at 5:39 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court